PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3008
_____

UNITED STATES OF AMERICA

v.

STATE OF DELAWARE DEPARTMENT OF
INSURANCE,
                                    Appellant
_____

On Appeal from the United States District Court
For the District of Delaware
(D.C. No. 1-20-cv-0829)
District Judge:  Honorable Maryellen Noreika
_____

Argued
November 8, 2022

Before:  JORDAN, SCIRICA, and RENDELL, *Circuit
Judges*

(Filed April 21, 2023 )
_____

James J. Black, III   [ARGUED]
Mark W. Drasnin
Jeffrey B. Miceli
Black & Gerngross
1617 John F. Kennedy Blvd.
Suite 1575
Philadelphia, PA   19103

Patricia A. Davis
Office of Attorney General of Delaware
Delaware Department of Justice
102 West Water Street – 3rd Floor
Dover, DE   19904

Kathleen P. Makowski
Office of Attorney General of Delaware
Department of Justice
820 N. French Street – Suite 1010
Wilmington, DE   19801
        *Counsel for Appellants*

Travis S. Hunter
Richards Layton & Finger
920 N. King Street
One Rodney Square
Wilmington, DE   19801
        *Counsel for Amicus Appellants*

Ward W. Benson
Kyle L. Bishop
United States Department of Justice
Tax Division
P.O. Box 227
Ben Franklin Station
Washington, DC   20044

Michael J. Haungs
Lauren E. Hume
Francesca Ugolini   [ARGUED]
United States Department of Justice
Tax Division
950 Pennsylvania Avenue
P.O. Box 502
Washington, DC   20044
      *Counsel for Appellee*

_____

## OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

This case pits Delaware's authority to protect corporate privacy against the power of the IRS to enforce the tax laws of the United States.  The dispute arises from the refusal of the Delaware Department of Insurance (the "Department") to comply with an IRS summons.  The Department relies on Title 18, Section 6920 of the Delaware Code, which generally prohibits the Department from disclosing certain information about captive insurance companies to anyone, including the

federal government, absent the companies' consent.[1]   But
§ 6920 does allow disclosure to the federal government if it
agrees in writing to keep the disclosed information
confidential.  The government did not and instead petitioned
the District Court to enforce its summons.  The Court granted
that petition.   The Department argues that, under the
McCarran-Ferguson Act ("MFA"), 15 U.S.C. § 1011 et seq.,
Delaware law as embodied in § 6920 overrides the IRS's
statutory authority to issue and enforce summonses, so the
District Court's order should be reversed.

While the MFA does protect state insurance laws from
intrusive federal action when certain requirements are met, the
District Court concluded that, before any such reverse-
preemption occurs, our precedent requires that the conduct at
issue – in this case, the refusal to produce summonsed
documents – must constitute the "business of insurance" within
the meaning of the MFA.  **[J.A. at 008, 012-17, 024-33.]**  The
District Court held that this threshold requirement was not met
here, and we agree.  We will therefore affirm.

I.    BACKGROUND

A.    **Origin of the McCarran-Ferguson Act and Its
Relevant Text**

The MFA was Congress's response to the Supreme
Court's decision in *United States v. South-Eastern
Underwriters Ass'n*, 322 U.S. 533 (1944).   Before that

---

[1] A captive insurance company is an insurance company
that is wholly owned and controlled by its insureds.  *Avrahami
v. Comm'r of Internal Revenue*, 149 T.C. 144, 176 (T.C. 2017).

decision, "it had been assumed that '[i]ssuing a policy of insurance [wa]s not a transaction of commerce,' subject to federal regulation." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 499 (1993) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183 (1869)).    That changed when *South-Eastern Underwriters* held that "insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws in particular[] were applicable to them." *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 458 (1969).

Fearing that *South-Eastern Underwriters* would "undermine state efforts to regulate insurance," Congress enacted the MFA. *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999).  Relevant to our inquiry today are the provisions of the statute codified at §§ 1011 and 1012 of Title 15 of the United States Code.[2]  The first, denominated "Declaration of policy," states:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011.  Then, § 1012 provides:

---

[2] All references herein to the MFA are to its provisions as codified.

**(a) State regulation**

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

**(b) Federal regulation**

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012.

The Supreme Court later, in *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408 (1946), "explained the legislative intent behind the statute's preclusionary approach to federal intrusion on state insurance laws." *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 189 (3d Cir. 1998). It said, among other things, that Congress's "purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co.*, 328 U.S. at 429.

Those closing words – "the business of insurance" – have high salience in this dispute over captive insurance companies.

## B.    Overview of Captive Insurance

A "captive" insurance company is one that is wholly owned and controlled by its insureds. *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 176 (T.C. 2017). This type of entity protects the owner-insured while simultaneously allowing the benefit of reaping the captive company's underwriting revenues. Businesses that are experienced in establishing and managing captive insurance companies are called "captive managers." (J.A. at 241 at ¶ 14.) Captive managers facilitate the creation and management of captive insurers in jurisdictions that have passed captive insurance enabling legislation, as has Delaware.

Captive insurance is effectively a kind of self-insurance, but one with an added tax benefit: "Amounts paid for insurance are deductible under [26 U.S.C. § 162(a)] as ordinary and necessary expenses paid or incurred in connection with a trade or business[,]" as opposed to "amounts set aside in a loss reserve as a form of self-insurance," which are not deductible. *Avrahami*, 149 T.C. at 174. The upshot is that a company that wishes to hold money aside in case of loss can reduce its taxable income by paying such money as premiums to its captive insurer and then deducting the premiums.

Title 18 of the Delaware Code (the "Delaware Insurance Code") governs insurers and insurance professionals licensed under Delaware law. Chapter 69 of the Delaware Insurance Code is the part of the state's statutory scheme governing the formation, licensing, and regulation of captive insurers. Under

Chapter 69, corporations and various alternative entities can apply for certificates of authority from the Insurance Commissioner of the State of Delaware to operate as captive insurance companies.[3]  If a certificate is granted, the resulting Delaware captive insurance company is generally subject to triennial examinations in which the Department "thoroughly inspect[s] and examine[s] [the company's] affairs to ascertain its financial condition, its ability to fulfill its obligations and its compliance with the provisions of [Chapter 69]." 18 Del. Code Ann. § 6908.

Section 6920 of the Delaware Insurance Code, which is central to the present controversy, relates to the confidential treatment of materials and information that captive insurers are required to submit to the Department.  It provides, in pertinent part:

> All portions of license applications reasonably designated confidential by … an applicant captive insurance company, … and all examination reports, … recorded information, [and] other documents, … produced or obtained

---

[3] A would-be captive insurance company may apply for a "certificate of authority" from the Commissioner, as provided in 18 Del. Code Ann. § 6903 ("License application; certificate of authority").  Once issued a "certificate of authority," a captive insurance company is "authoriz[ed] … to do insurance business in th[e] State."  *Id*. § 6903(f).  The terms "Commissioner" and "the Department" will be used herein interchangeably, as there is no issue in this case relating to delegation of the Commissioner's authority.

by or submitted or disclosed to the Commissioner that are related to an examination pursuant to this chapter must, unless the prior written consent … of the captive insurance company … has been obtained, be given confidential treatment …, and may not be … disclosed to any other person at any time except:

    ….

To a law-enforcement official or agency of … the United States of America so long as such official or agency agrees in writing to hold it confidential and in a manner consistent with this section.

§ 6920.

In short, § 6920 prohibits the Department from disclosing covered information to anyone, including the federal government, unless the captive insurance company consents, or, as relevant here, the federal government agrees in writing to treat the information as confidential.

## C. Overview of "Micro-Captive" Insurance and Tax Concerns

As mentioned above, captive insurance can be used to obtain a tax benefit for the insureds by permitting them to claim deductions for the premiums they pay. But that does not prevent the IRS from taxing the captive insurers. "While the [Internal Revenue] Code permits the deduction of insurance premiums *paid*, it also taxes insurance premiums *received*." *Avrahami*, 149 T.C. at 174 (emphasis in original); *see also id.*

at 175 ("Insurance companies – other than life-insurance companies … – are generally taxed on their income in the same manner as other corporations.").

There is, however, an exception of particular relevance here: insurance companies whose annual net written premiums do not exceed a specified maximum and meet certain other requirements may elect tax treatment under 26 U.S.C. § 831(b).[4]  *See id*. at 176, 178-79 & n.46.  That election allows a captive insurance company to pay <u>no</u> taxes on the premiums it receives.  *IRS Notice of Transaction of Interest – Section 831(b) Micro-Captive Transactions* ("2016 IRS Notice"), 2016-47 I.R.B. 745 (2016).  Instead, it only pays tax on any eligible investment income it may have.  *Id*.; *see also Avrahami*, 149 T.C. at 176 (explaining that such an entity is "subject to tax only on its taxable investment income").  In that

---

[4] That section generally provides that instead of paying taxes computed using their taxable income, insurance companies that have elected this treatment have their "tax computed by multiplying" their "taxable investment income" "by the rates provided in [26 U.S.C.] section 11(b)."  26 U.S.C. § 831(b)(1) (setting the general tax consequence for certain small insurance companies).  The 2015 amendments to 26 U.S.C. § 831(b) set the threshold at $2.2 million and provided that this will periodically be "increased for inflation." *Avrahami*, 149 T.C. at 176 n.46.  The federal government represents that as of the time it filed its Answering Brief, the maximum still stands at $2.2 million.  The 2015 amendments to 26 U.S.C. § 831(b) "added new diversification requirements that an insurance company must meet in order to receive the favorable tax treatment of subsection (b)."  *Id.*

circumstance, then, the insured can deduct premiums from its taxable income without its captive insurer being taxed on those same premiums.

Insurance companies that are both "captive insurers" and taxed under 26 U.S.C. § 831(b) are known as "micro-captives." The term "micro-captive" does not appear anywhere in the Delaware Captive Law or the Internal Revenue Code. It is simply an apt description used by the IRS and the Tax Court, among others, to designate a captive insurance company whose annual net written premiums do not exceed the maximum allowed for it to elect the special tax treatment available under § 831(b). *See Avrahami*, 149 T.C. at 176, 178-79 (discussing such companies and transactions, their tax consequences, and their potential for abuse).

While the IRS has explicitly "recognize[d] that related parties may use captive insurance companies that make elections under § 831(b) for risk management purposes that do not involve tax avoidance," it has identified "micro-captive" transactions as having "a potential for tax avoidance or evasion." 2016 IRS Notice, 2016-47 I.R.B. 745. For example, "[u]nscrupulous promoters" may "persuade closely held entities to … create captive insurance companies onshore or offshore, drafting organizational documents and preparing initial filings to state insurance authorities and the IRS." IRS News Release IR-2015-19 (Feb. 3, 2015), https://www.irs.gov/pub/irs-news/IR-15-019.pdf. Too often, these micro-captives are not providing bona fide insurance. "Underwriting and actuarial substantiation for the insurance premiums paid are either missing or insufficient." *Id.* Instead, their purpose is to serve as a conduit for inflated premiums that their insureds can deduct as business expenses, while the faux

insurer, by keeping the premiums below the threshold for § 831(b), is taxed only on the investment income it may have. *Id.* The promoters help paper over the charade and may "assist[] with creating and 'selling' to the entities often times poorly drafted 'insurance' binders and policies to cover ordinary business risks or esoteric, implausible risks for exorbitant 'premiums[.]'" *Id.* All the while, the insured may retain actual commercial insurance coverage from traditional insurers. *Id.*

Accordingly, "the IRS has applied increased scrutiny to these transactions, adding them to [its] 'dirty dozen' list of tax scams in 2015 and declaring them 'transactions of interest' in 2016." *Avrahami*, 149 T.C. at 173. A 2016 IRS Notice declared micro-captive transactions satisfying certain criteria as "transactions of interest" that must be reported to the IRS. IRS Notice, 2016-47 I.R.B. 745.

## D.    Factual Background

The summons enforcement action now on appeal arises from the IRS's investigation of Artex Risk Solutions, Inc. ("Artex"), and Tribeca Strategic Advisors, LLC ("Tribeca"), the latter entity being wholly owned by Artex. The investigation seeks to determine whether Artex and Tribeca are liable for penalties under 26 U.S.C. § 6700 for promoting abusive tax shelters.[5] The federal government successfully enforced two summonses issued to Artex, leading to a production of documents in 2014. Those documents included

---

[5] The origins of that investigation are immaterial to the issues before us now.

two email chains between Artex and the Delaware Department of Insurance that piqued the interest of the IRS and led to the summons at issue here.  The first email chain related to the issuance by the Department of certificates of authority in December 2012 to an Artex client.  The second involved the Department's Director of Captive and Financial Insurance Products, who declined a dinner invitation from Artex but scheduled a breakfast meeting the following day with six Department employees and Artex.

On October 30, 2017, the IRS issued an administrative summons to the Department for testimony and certain records relating to filings by and communications with Artex, Tribeca, or others working with those companies.  Of main concern is what the parties and District Court refer to as "Request 1" of the summons.  Request 1 seeks "all electronic mail between [the Department] and Artex and/or Tribeca related to the Captive Insurance Program."  (J.A. at 065.)  The "Captive Insurance Program" is broadly defined in the summons as "any arrangement managed by Artex or Tribeca wherein captive insurance companies, defined by [Chapter 69 of the Delaware Insurance Code], provide either insurance and/or reinsurance." (J.A. at 063.)  At the time of the summons, it seems the IRS believed that the Department had issued 191 certificates of authority to insurance companies created by Artex and Tribeca.[6]  It directed the Department to appear before a revenue agent to give testimony and produce requested documents by November 29, 2017.

---

[6] The Department has represented that it actually issued 225 certificates of authority to companies created by Artex and Tribeca.

The Department responded with objections to the summons, including confidentiality objections pursuant to § 6920 of the Delaware Insurance Code. The IRS declined the Department's request to agree in writing to abide by the confidentiality requirements of § 6920. The Department has thus continued to refuse to produce any emails or other documents responsive to Request 1 that relate to specific captive insurers created by Artex and Tribeca, absent the affirmative consent of the relevant captive insurers, and no representative of the Department has ever appeared to provide testimony. Any limited compliance with the summons was tailored to avoid violating § 6920 and does not bear on the issues before us.

### E.      Procedural Background

Given the Department's refusal to comply with the summons, the federal government filed in the District Court a petition to enforce it, supported by a declaration from IRS Revenue Agent Bradley Keltner. Specifically, the government sought an order directing the Department to comply with Request 1 of the summons and the demand for testimony. A Magistrate Judge, the Honorable Christopher J. Burke, issued an order to show cause why the Department should not be compelled to comply with the summons. The Department opposed the petition for enforcement and moved to quash the summons. Of importance here, the Department argued that, under the MFA, § 6920 reverse-preempts the IRS's summons authority.[7]

---

[7] To make out a prima facie case for the validity of a summons, the federal government must show each of the following: (1) "that the investigation will be conducted

The Magistrate Judge issued a thorough Report and Recommendation concluding that the petition to enforce the summons should be granted. He recommended against any holding of reverse-preemption under the MFA, after analyzing the question at length. First, he explained how MFA reverse-preemption is "an exception to the general rule" that a "state statute yields under the doctrine of preemption" in the face of a conflicting federal statute. (J.A. at 025.) Specifically, he explained that, unlike the normal situation, the MFA "permits state laws to trump federal laws in certain circumstances (or to 'reverse preempt' those laws)." (J.A. at 025.) Further, he described how the MFA's reverse-preemption provision, codified in § 1012(b), contains two clauses, with the first

---

pursuant to a legitimate purpose"; (2) "that the inquiry may be relevant to the purpose"; (3) "that the information sought is not already within the [IRS's] possession"; and (4) "that the administrative steps required by the [United States Tax] Code have been followed." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1262 (3d Cir. 1990) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)) (internal quotation marks omitted). Before Judge Burke, the Department argued the third prerequisite had not been shown. He decided that the federal government had met its burden on the challenged *Powell* factor and that the Department had not rebutted it. The Department did not object to that finding, which also underpins the District Court's decision based on the Report and Recommendation of Judge Burke. Likewise, the Department has not raised that point on appeal and thus it is forfeited. *See Geness v. Cox*, 902 F.3d 344, 355 (3d Cir. 2018) (explaining that an appellant forfeits an argument in support of reversal if it is not raised in the opening brief).

addressing "federal laws in general," and the second addressing "application of federal antitrust laws." (J.A. at 025 (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 167 n.1 (3d Cir. 2001)).)

The Magistrate Judge then said that in a non-antitrust matter, such as this case, the first clause of § 1012(b) asks three questions (the "first clause requirements") that must be answered in the affirmative before reverse-preemption is appropriate under the MFA. Those questions are: "(1) whether the state law is enacted 'for the purpose of regulating the business of insurance'; (2) whether the federal law does not 'specifically relat[e] to the business of insurance'; and (3) whether the federal law would 'invalidate, impair, or supersede' the State's law." (J.A. at 026 (citing *Humana*, 525 U.S. at 307).)

Argued by the federal government, the Magistrate Judge went on to say "that before the Court applies the above-referenced three-factor test drawn from [§ 1012(b)], it must first assess whether an additional, threshold element … has been met: 'whether the activity complained of constitutes the "business of insurance."'" (J.A. at 026 (emphasis removed) (quoting *Highmark*, 276 F.3d at 166 (quoting *Sabo*, 137 F.3d at 191)).) He observed that our precedent has "clearly and repeatedly instructed that … [courts] must first assess whether the movant has satisfied the threshold element, before applying [§ 1012(b)]'s three-part test." (J.A. at 028.) Further, he rejected the argument that, based on the Supreme Court's decisions in *U.S. Department of Treasury v. Fabe*, 508 U.S. 491 (1993), and *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), our threshold "business of insurance" inquiry is no longer good law.

With that said, the Magistrate Judge recommended the conclusion that, under our threshold inquiry, the challenged conduct did not constitute the "business of insurance" and so was not subject to the reverse-preemption provision of the MFA.  He suggested that, in determining whether the reverse-preemption provision in § 1012(b) applies, courts should look at the discrete conduct in question (here, resisting an IRS summons, as dictated by § 6920), rather than examining how the ostensibly reverse-preempting provision of state law fits into the State's overarching regulatory scheme.  He agreed with the federal government that the conduct at issue in this case is "fairly characterized as '[r]ecord maintenance' or 'the dissemination and maintenance of information, documents, and communications [maintained by the state.]'" (J.A. at 029 (quoting D.I. 23 at 12-23).)  Parsing the language of § 6920, he determined that the "entire focus is on the type of access that [the Department] may or may not provide to third parties (including federal law enforcement officers) regarding a captive insurer's confidential information." (J.A. at 029.)  He thus recommended concluding such conduct does not constitute the "business of insurance."

In sum, the recommended holding was that the MFA does not apply to the particular conduct of the Department now at issue and, accordingly, that the petition to enforce the IRS summons should be granted and the motion to quash should be denied.  The Department filed timely objections to the Magistrate Judge's Report and Recommendation, and the District Court overruled them, adopting the Report and Recommendation, granting the petition to enforce the summons, and denying the motion to quash.  This timely appeal followed.

## II.    DISCUSSION[8]

The Department argues, first, that our threshold inquiry is no longer good law and, second, that even if it remains good law, the District Court erred in saying it was not satisfied here. Both of those arguments proceed from a fundamental misreading of our precedent. Accordingly, before turning to either argument, we review our holding in *Sabo v. Metropolitan Life Insurance Co.*, 137 F.3d 185 (3d Cir. 1998), and our reaffirmance of *Sabo* in *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001).

### A.    Our Threshold Inquiry Precedent

### 1.    Origin and General Principles

In *Sabo*, we interpreted subsections 1012(a) and 1012(b), as well as the import of the Supreme Court's discussion of the MFA in *SEC v. Nat'l Sec., Inc.* ("*National Securities*"), 393 U.S. 453 (1969). We concluded that there is a "threshold question in determining whether the antipreemption mandate of . . . § 1012(b) applies," and that the

---

[8] The District Court had jurisdiction under 26 U.S.C. §§ 7604(a), 7402(b), and 28 U.S.C. §§ 1340, 1345. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review for clear error whether the factual prerequisites for enforcement of an IRS summons have been met, and we review questions of law de novo. *United States v. Ins. Consultants of Knox, Inc.*, 187 F.3d 755, 759 (7th Cir. 1999). The issue of reverse-preemption under the MFA is one of law. *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 263 (3d Cir. 2007).

inquiry is "whether the challenged conduct broadly constitutes the 'business of insurance' in the first place." *Sabo*, 137 F.3d at 189-91.    Only when that question is answered in the affirmative do the "three distinct requirements" from the first clause of § 1012(b) come into play. *Id*. at 189.    For reverse-preemption to be appropriate, all three of those "first clause" requirements must be met: "(1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law."[9] *Id*.

In *Sabo*, we were at pains to demonstrate that the threshold inquiry – again, whether the challenged conduct constitutes the "business of insurance" – had a firm foundation in § 1012(a).  The issue presented in *Sabo* was whether reverse-preemption under the MFA barred an insurance salesman from suing his former employer under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-68, when the "challenged predicate acts ar[o]se [out] of the defendant's

---

[9] This is the test applicable in all but antitrust cases.  In antitrust cases, the second clause, or "antitrust clause," of § 1012(b) provides a statutory exemption from antitrust liability "for activities that (1) constitute the 'business of insurance,' [and] (2) are regulated pursuant to state law," so long as they "(3) do not constitute acts of 'boycott, coercion or intimidation,'" under § 1013(b).  *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1133 (3d Cir. 1993).  Antitrust issues are not in play here, but the distinction between antitrust and non-antitrust cases under the MFA is noteworthy because of the different treatment the two categories receive under § 1012(b).

insurance business." *Sabo*, 137 F.3d at 187. The parties' disagreement focused on "the scope of the 'insurance business' covered by [the MFA], and whether it applied to" the conduct at issue in the dispute. *Id*. at 187-88. That conduct was a churning scheme involving the fraudulent trading of insurance policies, the fraudulent advertising of insurance policies as a retirement savings plan, and the coercing of employees to engage in those acts. *Id*.

We decided that those activities constituted the "business of insurance," after analyzing the proper role and basis for the threshold inquiry. *Id*. at 188-92. We stated that "Section [1012(a)] by its terms, affirmatively subjects the business of insurance to state regulation." *Id*. at 189. We then explained that the MFA took the "further step of proscribing unintended federal interference of state insurance laws by a general mandate," quoting the requirements of the first clause of § 1012(b). *Id*. We noted that our preemption analysis would focus on "the first clause of section 1012(b)," rather than the second clause because the complaint was not "grounded in federal antitrust law." *Id*. at 189 n.1.

We then analyzed the interplay between § 1012(a) and § 1012(b), saying, "[i]f it is determined that the alleged conduct at issue broadly constitutes the 'business of insurance,' and is therefore subject to state regulation under section 1012(a), the next issue is whether the anti-preemption mandate of section 1012(b) precludes a federal cause of action." *Id*. at 189. We did not engraft an atextual limitation onto the requirements of the first clause of § 1012(b). Rather, citing *National Securities*, we made it clear that we were relying on the text of § 1012(a) for the threshold inquiry:

> The threshold question in determining whether the antipreemption mandate of 15 U.S.C. § 1012(b) applies is whether the challenged conduct broadly constitutes the "business of insurance" in the first place. 15 U.S.C. § 1012(a). If the contested activities are wholly unrelated to the insurance business, then the [MFA] has no place in analyzing federal regulation because only when "[insurance companies] are engaged in the 'business of insurance' does the act apply."

*Id.* at 190 (quoting *National Securities*, 393 U.S. at 459–60). We concluded by observing again that, "[i]f the defendant's conduct does not constitute 'the business of insurance,' then the Act simply does not apply and there is no need to confront preclusion issues under § 1012(b)." *Id*.

Re-emphasizing the point, and, relying on another Supreme Court opinion, *U.S. Department of Treasury v. Fabe*, we noted that reverse-preemption applies when "the activity in question constitutes the business of insurance and … the specific state law was enacted with the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Sabo*, 137 F.3d at 191 (quoting *Fabe*, 508 U.S. at 505).[10]

---

[10] The phrase "the specific state law was enacted with the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance" derives from the Supreme Court's construction of the phrase: "for the purpose of regulating the business of insurance." *See Fabe*, 508 U.S. at 505 ("The broad category of laws enacted 'for the purpose

After *Sabo*, we reaffirmed the threshold inquiry in *Highmark*. "If the activity does not constitute the 'business of insurance,' then the [MFA] does not apply," we said.[11] 276 F.3d at 166 (citing *Sabo*, 137 F.3d at 190-91). If, however, the threshold inquiry is satisfied, "we then look to whether § 1012(b)" reverse-preempts the federal law in question. *Id.*

### 2. The Breadth of the Phrase "Business of Insurance"

The Supreme Court has provided further guidance on the meaning of the phrase "business of insurance," as used in the MFA. The phrase is undefined in the statute, so the Court has looked to "the ordinary understanding of that phrase, illumined by any light to be found in the structure of the Act

---

of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance.") (citing Black's Law Dictionary 1236, 1286 (6th ed. 1990)).

[11] In *Highmark* an insurance company sued a rival seeking injunctive relief and damages for advertisements that allegedly included misleading statements about the plaintiff's insurance, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). 276 F.3d at 163-64. The defendant moved to dismiss on two bases: first, that the advertisement did not substantially affect interstate commerce and, therefore, the Lanham Act did not apply, and, second, that the Lanham Act claims were reverse-preempted by the Pennsylvania Unfair Insurance Practices Act. *Id.* at 164. The district court denied the motion to dismiss and entered a preliminary injunction. *Id.* We affirmed. *Id.*

and its legislative history." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979). We do likewise, looking to how the Supreme Court employed that phrase in *National Securities*.

In its opinion there, the Court noted that Congressional debates surrounding the MFA were "mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies," none of which was then at issue in the case before it. *National Securities*, 393 U.S. at 458-59. Accordingly, the Court analyzed the phrase "business of insurance" in the broader context of Congress's reaction to *South-Eastern Underwriters*, and, in so doing, found "it [was] relatively clear what problems Congress was dealing with." *Id.* at 459. "Congress was concerned" with preserving for state regulation that which had been understood as beyond the Commerce Clause before *South-Eastern Underwriters*, specifically, "the type of state regulation that centers around the contract of insurance." *Id.* at 460.

Having thus set the stage, the Supreme Court identified the "core of the 'business of insurance'" as "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement[.]" *Id.* In addition, *National Securities* provided several examples of that "core": "the fixing of [insurance] rates"; "the selling and advertising of [insurance] policies"; and the "licensing of companies and their agents." *Id.* *National Securities*, however, made clear that the sweep of the "business of insurance" goes beyond the core to reach "other activities of insurance companies [that] relate so closely to their status as reliable insurers that they too must be placed in the same class."

*Id.* "[W]hatever the exact scope of the statutory term," the touchstone remains the impact on the "relationship between the insurance company and the policyholder." *Id.*

The Court later admonished that not everything that "indirect[ly] [a]ffects" policyholders or "redounds to the[ir] benefit" in some way falls within the "business of insurance." *Fabe*, 508 U.S. at 508-09 (citing *Royal Drug*, 440 U.S. at 216-17). After all, the "statute d[oes] not purport to make the States supreme in regulating all the activities of insurance companies[.]" *National Securities*, 393 U.S. at 459. Thus, "terms such as 'reliability' and 'status as a reliable insurer'" cannot "be interpreted" so "broad[ly]" that "almost every business decision of an insurance company could be included in the 'business of insurance.'" *Royal Drug*, 440 U.S. at 217.

## B. *Sabo* and *Highmark* Remain Good Law

In this appeal, the Delaware Department of Insurance argues that our decisions in *Sabo* and *Highmark* are no longer good law, citing three reasons. First, the Department argues that *Sabo* conflicts with the Supreme Court's earlier decision in *Fabe*, 508 U.S. 491. Second, it argues that *Sabo* was implicitly overruled by a later Supreme Court decision, *Humana Inc. v. Forsyth*, 525 U.S. 299. And third, it argues that our own decisions after *Sabo* and *Highmark* conflict with those two cases. More specifically, the Department says that the lack of any mention of the threshold inquiry in *Suter v. Munich Reinsurance Co.*, 223 F.3d 150 (3d Cir. 2000), represents the true post-*Humana* precedent of our Court, replacing *Sabo* and *Highmark*. None of those arguments holds water, and, contrary to each of them, the threshold inquiry

prescribed in *Sabo* and reiterated in *Highmark* remains the law of this Circuit.

The Department's arguments contain two foundational flaws. First, they misread the origins of the threshold inquiry. The contention that the threshold inquiry does not derive from § 1012(a) is plainly wrong, as demonstrated by the description we have just given of *Sabo*. *See supra* Section II.A.1.[12] As already noted, *Sabo* expressly cites § 1012(a) when stating that "[t]he threshold question in determining whether the antipreemption mandate of 15 U.S.C. § 1012(b) applies is whether the challenged conduct broadly constitutes the 'business of insurance' in the first place." *Sabo*, 137 F.3d at 190; *see also id*. at 189 ("If it is determined that the alleged

---

[12] The Department misunderstands footnote two of *Sabo*. We said there "that federal courts have seemingly disagreed as to the proper analytic inquiry into [MFA] preclusion[,]" and, therefore, we thought it important "to discuss our analysis in detail." *Id*. at 189 n.2. That footnote observed that some courts had adopted a three-part test "that does not require a specific conclusion that the defendant's conduct constitutes the business of insurance," but others had adopted a four-part test that did require such a specific conclusion. *Id*. Our holding that there is a threshold inquiry deriving from § 1012(a) relied on none of those cases. Indeed, it would have been difficult to do otherwise, as none of them relies on § 1012(a) for a threshold inquiry, and no one here suggests they do. In that context, our statement that "it is important to discuss our analysis in detail" is more naturally read as divergence from – not a subscription to – the position stated in those other cases.

conduct at issue broadly constitutes the 'business of insurance,' and is therefore subject to state regulation *under section 1012(a)*, the next issue is whether the anti-preemption mandate of section 1012(b) precludes a federal cause of action." (emphasis added)).  The quoted language from *Sabo* speaks for itself.

Second, as we proceed to discuss now, the Department perceives jurisprudential conflict where there is none.  Those supposed conflicts are instances where we or the Supreme Court analyzed MFA reverse-preemption under the first clause of § 1012(b), focusing on what was at issue in those cases. Whether reverse-preemption is warranted under the first clause of § 1012(b) when it is implicated is a separate question from whether reverse-preemption is implicated in the first place under § 1012(a).

### 1.    *Sabo* does not conflict with *Fabe*

By way of example, the Department wrongly asserts that *Fabe* conflicts with *Sabo*.  *Fabe* stands for the unremarkable proposition that the first clause of § 1012(b) has three requirements, but it does not foreclose a threshold inquiry derived from § 1012(a).  In *Fabe*, the liquidator of an insurance company brought a declaratory judgment action in federal court "seeking to establish that [a] federal priority statute [did] not preempt [an] Ohio law designating the priority of creditors' claims in insurance-liquidation proceedings."  508 U.S. at 495. The federal statute "accord[ed] first priority to the United States with respect to a bankrupt debtor's obligations[,]" while the Ohio statute "confer[red] only fifth priority upon claims of the United States in proceedings to liquidate an insolvent insurance company[.]"  *Id*. at 493.

*Fabe* quoted the first clause of § 1012(b) and gave passing acknowledgment to uncontested points. *Fabe*, 508 U.S. at 500-01. After that, "[a]ll that [was] left" for analysis, under the first clause, was "whether the Ohio priority statute [was] a law enacted 'for the purpose of regulating the business of insurance.'" *Id.*

The Supreme Court's treatment of that contested point included analysis akin to our threshold inquiry. The Court first clearly stated that "the Ohio statute" was "a law 'enacted for the purpose of regulating the business of insurance,' within the meaning of the first clause of § [1012(b)]." *Id.* at 505. It then backtracked, refusing to fully reverse-preempt the federal law with respect to creditors who were not policyholders, holding that the state law was "not a law enacted for the purpose of regulating the business of insurance" to the extent it benefited such creditors. *Id.* at 508 & n.8. Additionally, it refused to hold that the portion of the state law providing for administrative costs for creditors other than policyholders reverse-preempted federal law. *Id.* at 509. It reasoned that the provision's "connection to the ultimate aim of insurance [wa]s too tenuous." *Id.* Although pressed by the dissent to justify such a "compromise holding," *id.* at 518 (Kennedy, J., dissenting), the majority provided no textual hook for its holding. *See id.* at 508-09 & n.8 (arguing that the dissent had conceded that the statute need not "stand or fall in its entirety" and observing that the dissent had cited nothing preventing the majority from finding certain parts of the statute had effected a reverse-preemption and others had not). Of more importance for present purposes, it never foreclosed § 1012(a) from playing the role we have concluded it plays.

Simply put, while *Fabe* focuses on § 1012(b), it is not irreconcilable with our threshold inquiry or the conclusion that § 1012(a) is the source of it.

## 2.    *Sabo* does not conflict with *Humana*

Nor does *Humana* conflict with *Sabo* or overrule it.  In *Humana*, insurance policy beneficiaries alleged that an insurance company engaged in a scheme to hide discounts that the company had received from a hospital, and that it did so to prevent the beneficiaries from sharing in the savings.  525 U.S. at 303-04.  The plaintiffs contended that this violated both the Nevada law regulating insurance fraud and RICO.  *Id*. at 302.  Although the state and federal laws represented "differ[ing]" "remedial regimes," the Supreme Court concluded that "RICO can be applied in this case in harmony with the State's regulation," and, therefore, "the [MFA] does not bar the federal action."  *Id*. at 303.

*Humana* touched only on the first clause of § 1012(b), without suggesting a rejection of a threshold inquiry under § 1012(a).  The first sentence of the opinion introduced the case as one "concern[ing] the regulation of insurance by the states, as secured by the [MFA], 59 Stat. 33, as amended, 15 U.S.C. § 1011 et seq."  *Id*. at 302.  But that same paragraph made it apparent that the Court was going to limit its discussion solely to the one requirement of the first clause of § 1012(b) then in dispute[13] – whether RICO "'invalidate[d], impair[ed], or

---

[13] Recall that the three requirements for application of MFA reverse-preemption, as set forth in the first clause of § 1012(b), are as follows: "(1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law

supersede[d]' the State's regulation." *Id*. at 302-03.  Although *Humana* states that § 1012(b) is "the centerpiece of this case," *id*. at 306, it discusses only two of the three "first clause" requirements, and one of those only in passing, with the remaining one being assumed to be satisfied.  *Id*. at 307 ("RICO is not a law that 'specifically relates to the business of insurance.'  This case therefore turns on the question: Would RICO's application to the employee beneficiaries' claims at issue 'invalidate, impair, or supersede' Nevada's laws regulating insurance?").

That *Humana* proceeded to examine whether RICO conflicted with state law without tarrying along the way does not mean that *Humana* addressed the existence of a threshold inquiry derived from § 1012(a).  It did not, and thus does not foreclose it.  The Department's suggestion that *Humana* sets out the first clause of § 1012(b) as the exclusive "test for the [MFA]" preemption ignores what *Humana* makes plain in context – that the Court was quickly getting to the heart of the issue without purporting to write a treatise on every aspect of the MFA.[14]  *Cf. United States v. Sineneng-Smith*, 140 S. Ct.

---

regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law." *Highmark*, 276 F.3d at 166.

[14] While we refer to the inquiry derived from Section 1012(a) as a "threshold" one, it need not be addressed in every case.  Sound advocacy may well lead parties to concede or assume the threshold inquiry has been met, thus allowing them to address other requirements for MFA reverse-preemption that may be more readily dispositive.  Judicial economy may

1575, 1579 (2020) ("[Courts] wait for cases to come to them, and when [cases arise, courts] normally decide only questions presented by the parties.") (discussing the "principle of party presentation"); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968) ("[T]his Court does not decide important questions of law by cursory dicta inserted in unrelated cases."); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 738 n.41 (3d Cir. 1988) (declining appellee's "invitation to transform what is in essence stray language and at best no more than dicta into a binding holding").

---

likewise prompt a court to resolve an MFA reverse preemption question in a similar way.  Courts often assume satisfaction of some analytical steps, where appropriate, to get to the heart of a matter.  *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 234-43 (2009) (loosening the rigidly ordered two-step analysis of the qualified immunity inquiry and allowing courts to begin with either step to prevent the misuse of "substantial expenditure[s] of scarce judicial resources … [on matters that] have no effect on the outcome of the case"); *United States v. Leon*, 468 U.S. 897, 924 (1984) ("There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated."); *Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 3.    *Sabo* does not conflict with *Suter*

Also contrary to the Department's assertion, our own decision in *Suter v. Munich Reinsurance Co.* does not suggest there is a conflict between *Humana* and *Sabo*, or that *Humana* implicitly overrules *Sabo*. Indeed, *Suter* mentions neither case. *Suter* involved a suit brought in state court by the liquidator of an insurance company against a German reinsurance company over an alleged breach of "certain reinsurance treaties." 223 F.3d at 152. The reinsurance treaties "include[d] arbitration clauses governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards." *Id*. Congress enacted a removal provision, 9 U.S.C. § 205, as a part of an act to enforce that convention (the "Convention Act"). *Id*. at 154-55. Relying on those procedural tools, the defendant first removed the case to district court under 9 U.S.C. § 205, and then tried to both compel arbitration and stay the district court proceedings pending arbitration. *Id*. at 152. The plaintiffs argued for remand on three grounds, two of which are relevant here: first, that a provision in the reinsurance treaty waived the defendant's right to remove and, second, that the Convention Act and Federal Arbitration Act (the "FAA") were reverse-preempted by the MFA. *Id*. The district court remanded the case to state court on the first ground without reaching the plaintiffs' other arguments or ruling on the defendant's motion. *Id*. After reversing the district court on the only ground that it examined, we declined to affirm on the basis of MFA reverse-preemption. We examined only one of the three requirements of the first clause of § 1012(b) and found it was not satisfied. *Id*. at 162. To begin, we noted that "there is no contention that either the Convention Act or the FAA 'specifically relate to the business of insurance.'" *Id*. at 160. We briefly identified the remaining

requirements of the first clause of § 1012(b) and assumed one of them away without discussion. *See id.* at 160-61 ("Thus the only issues are whether these statutes as applied in the instant case invalidate, impair or super[s]ede a New Jersey statute that was enacted for the purpose of regulating the business of insurance."); *id.* at 161 ("For purposes of this decision, we will assume that [the statutory] provisions were enacted for the purpose of regulating the business of insurance[.]"). We then briefly explained why "application of the Convention Act to th[e] suit does not impair the New Jersey Liquidation Act." *Id.* at 162. Nothing in that analysis overrides *Sabo*, even if the approach looked at § 1012(b) without pausing at § 1012(a). Given *Sabo*'s status as pre-existing precedent, *Suter* could not have overruled *Sabo*, *see* Third Circuit I.O.P. 9.1, and there is no indication that it intended to.

### 4.    The    Department's    remaining arguments

The Department makes two additional points that warrant brief mention. First, it notes that we are alone in holding that there is a threshold inquiry derived from § 1012(a). Second, it contends that each of the other circuits that previously used a four-factor test have abandoned it. Neither point would, of course, overrule *Sabo* or *Highmark*, but they might provide a basis for en banc review if they were persuasive. *Cf. In re Krebs*, 527 F.3d 82, 86 (3d Cir. 2008) (a panel may neither overrule a prior precedential opinion "because we are no longer persuaded by its reasoning" nor because "[s]everal of our sister courts of appeals have decided the … issue" contrary to that precedent). They are not. The Department identifies no post-*Humana* precedential opinion of our sister circuits that engages in legal analysis grappling with

(let alone dispensing with) something akin to *Sabo*'s threshold inquiry under § 1012(a).

The one pre-*Humana* case that explicitly parts ways with *Sabo* is *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037 (7th Cir. 1998), and it misreads *Sabo*. Without explanation or analysis, *Autry* lumps *Sabo* in with opinions applying a four-factor test derived from § 1012(b). *Autry*, 144 F.3d at 1041. Hence, the reasons articulated in *Autry* for rejecting a four-factor test derived from § 1012(b) are errantly applied to *Sabo* because, as we have explained, *Sabo*'s threshold inquiry derives from § 1012(a).[15]

---

[15] *Autry* declined to find that its own four-part precedent was no longer good law. In a footnote, the opinion acknowledges the three-factor test that it recited does not square with *American Deposit Corp. v. Schacht*, 84 F.3d 834, 838 (7th Cir. 1996). But *Autry* suggests that it might be appropriate to apply the fourth factor later in the MFA analysis:

> In *Schacht* we first addressed whether the state statute was "enacted ... for the purpose of regulating the business of insurance." After answering that question in the affirmative, we asked whether the particular activity at issue in the case was part of the "business of insurance." No doubt we took this second step because *Fabe* counsels that a statute "need not be treated as a package which stands or falls in its entirety," *Fabe*, 508 U.S. at 509 n.8, and instead that a state statute should only displace federal law "to the extent that it regulates policyholders," *id*. at 508. Because we find that the Illinois statute

### C.    The Threshold Inquiry is Not Satisfied

We now turn to the task of applying the threshold inquiry.  That involves identifying the conduct being challenged by the party asserting federal supremacy and then asking if that conduct constitutes the "business of insurance."

### 1.    The Challenged Conduct is Non-Disclosure of Records Maintained by the State Absent a Confidentiality Agreement

To recap, the federal government brought this summons enforcement action to force the Department to provide information related to certain micro-captives.  The Department has steadfastly refused to provide that information without the federal government first signing a confidentiality agreement.  The Department's refusal, and that alone, is the challenged conduct.  More specifically, the challenged conduct is the Department's insistence that it need not provide documents and related testimony that are responsive to Request 1 of the summons.  The Magistrate Judge's Report and Recommendation, adopted by the District Court, characterized the conduct in fundamentally the same way, while noting that the conduct tracks the pertinent exception to the general

---

regulating premium financing agreements is not one "enacted ... for the purpose of regulating the business of insurance," we need go no further.

*Autry*, 144 F.3d at 1042 n.3.

disclosure proscription in § 6920 of the Delaware Insurance Code.

The Department proposes that, to define the challenged conduct for purposes of the threshold inquiry, we should examine the purpose of § 6920 and how it fits into the State's overall regulatory scheme. But that proposal is tantamount to asking us to skip the threshold inquiry. The Department wants us to characterize the challenged conduct by asking, effectively, whether § 6920 was "enacted … for the purpose of regulating the business of insurance." Transforming the threshold inquiry into that post-threshold requirement from the first clause of § 1012(b) cannot be reconciled with *Sabo*'s admonition that those are separate questions. *Sabo*, 137 F.3d at 191.

Furthermore, the Department's proposal is not faithful to how we went about characterizing the conduct at issue in *Sabo* and *Highmark* for purposes of the threshold inquiry. In *Sabo*, we defined the challenged conduct as a "churning scheme" involving fraudulently trading insurance policies, fraudulently advertising an insurance policy as a retirement savings plan, and coercing employees to engage in those activities. *Sabo*, 137 F.3d at 187, 191. Although such conduct, if it occurred, would violate state law, no reference was made to state law in characterizing that conduct. *Id*. at 191-92. In *Highmark*, the plaintiff alleged that a rival's advertisements included misleading statements about the plaintiff's insurance, ostensibly running afoul of the Pennsylvania Unfair Insurance Practices Act. *Highmark*, 276 F.3d at 163-64. We characterized "the action complained of" as "the advertising" or the "advertising practices of the parties," with no mention of the state law. *Id*. at 166. Thus, in keeping with *Sabo* and

*Highmark*, we reject the contention that defining the challenged conduct for purposes of the threshold inquiry entails examining the purpose of § 6920 and how it fits into Delaware's overall regulatory scheme.

### 2.    The Challenged Conduct Does Not Constitute the Business of Insurance

The Department's refusal to provide documents and testimony responsive to Request 1 of the summons is not the "business of insurance."[16]  As an initial matter, it is plainly not the "core of the 'business of insurance.'"  *See National Securities*, 393 U.S. at 460 ("The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement – these [are] the core of the 'business of insurance.'").  It also cannot reasonably be understood as "[an]other activit[y] of insurance companies [that] relate[s] so closely to [their] status as reliable insurers that [it] must be placed in the same class."  *Id*.  It stands, rather,

---

[16] The Report and Recommendation indicated the parties were generally in agreement that, if the petition were granted, the IRS would get both the documents and the testimony.  The Magistrate Judge noted that the Department made a passing argument that the federal government forfeited its ability to get testimony.  But he rejected that argument as being without legal support and that rejection was adopted by the District Court in its overall endorsement of the Report and Recommendation.  The Department does not mention the forfeiture argument before us and, thus, we do not address it.  *See Geness*, 902 F.3d at 355 (*supra* at note 10).

somewhat removed from the "relationship between the insurance company and the policyholder." *Id*.

The Department nevertheless presses the argument that, even if the challenged conduct is its adherence to the strictures of § 6920 in the face of an action to enforce Request 1 of the summons, such conduct constitutes the "business of insurance." That conclusion follows, the Department says, because the confidentiality provision at issue deals with materials submitted in connection with the licensure of would-be captive insurers and examinations of already-approved captive insurers "for the purpose of determining the solvency and safety of insurers, and for the protection of its policyholders." (Answering Br. at 38.) If § 6920 does not reverse-preempt the IRS's summons authority, the Department claims, then applicants and already-approved captive insurers will be less forthcoming with the Department. The Department therefore contends that affirming the District Court will indirectly endanger those who are insured. By that route, the Department reasons that its adherence to § 6920 should be placed in the category of the "business of insurance."

For that argument to hold water, however, we must accept that affirming the District Court would lead to a change in behavior by captive insurers (or their managers) that would reduce the reliability of captive insurers. That is a contention that cannot survive scrutiny. As an initial matter, the substantive requirements for licensure and continued permission to operate under certificates of authority issued by the Department is not altered by our affirmance of the District Court's ruling. The Department has the authority to obtain documents it requires for licensure and subsequent examinations and can impose consequences on companies that

will not provide them. *See*, *e.g.*, 18 Del. Code Ann. §§ 6903, 6908, 6909.[17]    Simply put, the Department will be no less

---

[17] Although no case has been cited to us construing any of these provisions of the Delaware Insurance Code, it seems clear on their face that they endow the Department with such powers. For example, one provision provides in part: "Before receiving a certificate of authority, an applicant captive insurance company shall file with the Commissioner a certified copy of its organizational documents, a statement under oath of its president or other authorized person showing its financial condition, and any other statements or documents required by the Commissioner." 18 Del. Code Ann. § 6903(c)(1). It, further, indicates that the Department has the authority not to approve the certificate in the first instance if its filings do not comply with Delaware Captive Law. *See id.* § 6903(f) ("If the Commissioner is satisfied that the documents and statements that such captive insurance company has filed comply with the provisions of this chapter, the Commissioner may grant a certificate of authority authorizing it to do insurance business in this State…."). As previously mentioned, captive insurance companies are generally examined triennially to determine, among other things, their "ability to fulfill [their] obligations and [their] compliance with the provisions of this chapter." 18 Del. Code Ann. § 6908. The Department may "suspend or revoke" a captive insurance company's certificate of authority, if, "upon examination, hearing or other evidence," the Department finds that the company has "refus[ed] or fail[ed] to submit … any … report or statement required by law or by lawful order of the Commissioner" or "fail[ed] otherwise to comply with the laws of" Delaware. 18 Del. Code Ann. § 6909.

entitled to the information it currently receives to license captive insurance companies than it has previously been. The same is true of the Department's entitlement to information to determine whether already-licensed captive insurance companies should be allowed to continue to operate.

Moreover, according to the Department and Amici, the information sought here is as legally obtainable by a direct summons or subpoena to the captive insurance companies (or, perhaps, to their managers) as a summons directed to the Department. Accepting those arguments on their own terms, insurance companies will have no plausible reason to withhold information from the Department that turns on the outcome of this case. That is, we are being asked to accept that, but for the potential availability of the novel argument that § 6920 reverse-preempts the IRS's summons authority, a prospective or existing captive insurer will intentionally withhold required information from the Department.

But if a captive insurer is so well informed about the IRS's enforcement powers and defenses against them that it thinks of MFA reverse-preemption in this context, such a company is almost certainly aware of the obvious threat of a direct IRS summons or subpoena. And it must also be aware that being less than forthcoming with the Department risks foregoing or losing a certificate of authority to operate as an insurer. In short, it is hard to see the causal connection the Department is trying to draw. If enforcement of the summons is not the but-for cause of a company's changing its transparency (or lack thereof) with the Department, then the Department is in the same position regardless of how we decide the present dispute. And if that is so, then affirming the District Court will neither undermine the insurer-insured

relationship nor the insurer's reliability as an insurer. Accordingly, we reject the Department's argument that its adherence to § 6920 constitutes the "business of insurance."

### III.    CONCLUSION

For the forgoing reasons, the District Court's order will be affirmed.