No. 21-3008

# United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Petitioner-Appellee*,

v.

DELAWARE DEPARTMENT OF INSURANCE,
*Respondent-Appellant*.

On Appeal from the U.S. District Court for the
District of Delaware (Wilmington)
No. 1:20-cv-00829-MN-CJB

## APPELLANT DELAWARE DEPARTMENT OF INSURANCE'S PETITION FOR REHEARING AND REHEARING EN BANC

KATHLEEN P. MAKOWSKI
Deputy Attorney General
1007 Orange Street, Suite 1010
Wilmington, DE 19801
(302) 674-7326
Kathleen.Makowski@Delaware.gov

and

PATRICIA A. DAVIS
State Solicitor
102 W. Water Street
Dover, DE 19904
(302) 257-3233
PatriciaA.Davis@Delaware.gov

JAMES J. BLACK, III
JEFFREY B. MICELI
MARK W. DRASNIN
Black & Gerngross, P.C.
1617 John F. Kennedy Blvd.
Suite 1575
Philadelphia, PA 19103
Tel. (215) 636-1650
jblack@blackgern.com
jmiceli@blackgern.com
mdrasnin@blackgern.com

*Counsel for Respondent-Appellant*
Delaware Department of Insurance

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

RULE 35.1 STATEMENT OF COUNSEL ..............................................1

INTRODUCTION ...................................................................................2

ARGUMENT ...........................................................................................7

I.    The  Panel's Decision is Contrary to Decisions of the
Supreme Court, this Court, the Text of the McCarran-Ferguson
Act and the Decisions of Other Circuit Courts................................7

        A.    The Panel Improperly Used 15 U.S.C. §1012(a) to Restrict the Reverse-
Preemption Analysis Under the First Clause of §1012(b) ...................7

                1.    The Panel's Decision  Is Contrary to Decisions
of the Supreme Court and this Court .........................................7

                2.    The Panel's Decision Is Contrary to the Text of
15 U.S.C. §1012(a) ..................................................................10

        B.    The Decision of the Panel Is Contrary to Decisions of the Other
Circuit Courts of Appeal Considering the Issue .................................15

II.    The Panel Erred In Determining that the Delaware Statute
Did Not Constitute the "Business of Insurance" ...........................17

CONCLUSION......................................................................................20

COMBINED CERTIFICATION ...........................................................21

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*B & G Constr. Co., Inc., v. Officer of Workers' Comp. Programs*,
    662 F.3d 233 (3d Cir. 2011) ...............................................................15

*Barnett Bank of Marion County, N.A. v. Nelson*,
    517 U.S. 25 (1996) .........................................................................11

*Dehoyos v. Allstate Corp.*,
    345 F.3d 290 (3d Cir. 2003) ...............................................................9

*Fed. Trade Comm'n v. Nat'l Cas. Co.*,
    357 U.S. 560 (1958)........................................................................18

*Forsyth v. Humana, Inc.,*
    114 F.3d 1467 (9th Cir. 1999) *aff'd sub nom Humana Inc. v. Forsyth,*
    *525 U.S. 299 (1999)*........................................................................9

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
    276 F.3d 160 (3d Cir. 2001) ....................................................7, 18

*Humana Inc. v. Forsyth,*
    525 U.S. 299 (1999).................................................................. 1, 7-9

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ........................................ 1, 13-15, 20

*Market Co. v. Hoffman*,
    101 U.S. 112 (1879)........................................................................15

*Owens v. Aetna Life & Cas. Co.*,
    654 F.2d 218 (3d Cir. 1981) ...........................................................19

*Sabo v. Metropolitan Life Ins. Co.*,
    137 F.3d 185 (3d Cir. 1998) .................................................*passim*

*Sec. & Exch. Comm'n v. Nat'l Sec., Inc.*,
    393 U.S. 453 (1969)......................................................... 1, 18-19

**<u>Cases (Cont.)</u>**                                                                        **<u>Page</u>**

*South Jersey Sanitation Co., Inc. v. Applied Underwriters,*
    *Captive Risk Assurance Co., Inc.,*
    840 F.3d 138 (3d Cir. 2016) ................................................. 1, 7-8

*Suter v. Munich Reins. Co.,*
    223 F.3d 150 (3d Cir. 2000) ......................................................... 7-8

*Ticor Title Ins. Co. v. F.T.C.,*
    998 F.2d 1129 (3d Cir. 1993) ......................................1, 13, 15, 20

*Travers v. Federal Express Corp.,*
    8 F.4th 198 (3d Cir. 2021) ...........................................................18

*United States Dep't of Treasury v. Fabe,*
    508 U.S. 491 (1993)...............................................1, 7-9, 12-13, 15

**<u>Statutes</u>**                                                                            **<u>Page</u>**

15 U.S.C. §1012(a) ..........................................................................*passim*

15 U.S.C. §1012(b) ..........................................................................*passim*

18 *Del. C.* §6920 ................................................................. 2-3, 11, 19

**<u>Other</u>**                                                                              **<u>Page</u>**

*Humana, Inc. v. Forsyth*,
    1998 WL 644660 (U.S.) (U.S. Resp. Brief, 1998)..........................9

# RULE 35.1 STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that the Panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court.

1.    The Panel's decision is contrary to the following decisions of the Supreme Court of the United States and this Court: *United States Dep't of Treasury v. Fabe,* 508 U.S. 491 (1993); *Humana Inc. v. Forsyth,* 525 U.S. 299 (1999); *Ticor Title Ins. Co. v. FTC*, 998 F2d 1129 (3d Cir. 1993); *Suter v. Munich Reins. Co.*, 223 F.3d 150 (3d Cir. 2000); *In re Insurance Brokerage Antitrust Litg*, 618 F.3d 300 (3d Cir. 2010); and *S. Jersey Sanit. Co., Inc. v. Applied Underwriters Captive Risk Assur. Co., Inc.*, 840 F.3d 138 (3d Cir. 2016).

2.    If any part of the Panel's decision that a §1012(a) threshold is required or allowed under the McCarran Ferguson Act was correct, its articulation of such threshold violates the dictates of the following decisions of the Supreme Court of the United States and this Court:  *S.E.C. v. National Securities, Inc.* 393 U.S. 453 (1969); *United States Dep't of Treasury v. Fabe,* 508 U.S. 491 (1993); *Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185 (3rd Cir. 1998).

This appeal also involves questions of exceptional importance, *i.e.*:

1.      The Panel's imposition of a threshold under 15 U.S.C. §1012(a) conflicts with decisions of each of the other Circuit Courts of Appeals which have enunciated a McCarran-Ferguson test.

2.      The erroneous test used by the Panel for McCarran-Ferguson reverse-preemption results in situations where statutes "enacted for the purpose of regulating the business of insurance" are not given protection under the McCarran-Ferguson Act, despite otherwise complying with 15 U.S.C. §1012(b); a result at odds with the text of the McCarran-Ferguson Act.

/s/ *James J. Black, III*
James J. Black, III


# INTRODUCTION

This case involves 18 *Del. C.* §6920[1] of the Delaware Insurance Code governing the treatment of captive insurer licensing and application information and information derived from financial examinations.  The statute prohibits the Commissioner of Insurance from releasing certain information without a written agreement to hold that information confidential and in a manner consistent with the statute. Every state has similar statutes allowing insurance departments to receive

---

[1] The relevant portion of the statute is quoted in the Panel Opinion at 8-9.

and share insurer's information and which are designed to promote the free transmission of sensitive information from captive insurance companies. Rather than complying with the provision which allows law enforcement and other government agencies to receive the information, the IRS seeks the information through a general summons, without agreeing to the statutorily required confidentiality provisions.

At its core, the IRS's complaint is that the benefits given to certain captive insurance companies under the Tax Code can incentivize fraud. The Delaware Department of Insurance (the "Department") provided the material it could legally provide. The IRS seeks to require the Commissioner to violate express Delaware law by demanding information that §6920 specifically prohibits him from providing. The IRS asserts that its general summons provisions override Delaware's specific laws relating to the licensing and examination of captive insurers. However, the McCarran-Ferguson Act reverses the customary federal preemption rules, mandating that specific state insurance statutes "reverse-preempt" general federal laws such as the summons statute. By failing to apply the test articulated by the Supreme Court, Courts of this Circuit, and several other Circuits, the Panel decision abrogates McCarran-Ferguson's mandated state supremacy in the field of the regulation of insurance. The Department shares the IRS's concern that captive insurance companies' special treatment under the Tax Code requires scrutiny to

avoid abuse, but McCarran-Ferguson is not the proper target of those concerns. Rather than address the tax code, the IRS and the Panel decision disregarded Congress, the Supreme Court, and this and other Circuits' analysis of McCarran-Ferguson's requirements.

The Department submits this Petition for Reargument to correct two fundamental errors made by the Panel. First, the Panel erred by finding that the test for reverse-preemption under the first clause of the McCarran-Ferguson Act[3] is not the three-factor test[4] enunciated by the Supreme Court, this Circuit, and each of the other Circuit Courts of Appeal which have considered the issue. Instead, the Panel relied upon a 1998 Panel decision [5] which found an additional requirement under 15 U.S.C. §1012(a): "whether the challenged conduct constitutes the 'business of insurance.'" Panel Opinion (hereinafter "Op.") at 19 (citing *Sabo*).

---

[3] "Reverse-preemption" refers to the concept that federal statutes not specifically identified in the McCarran-Ferguson Act or not yet enacted would not automatically override state insurance regulation,otherwisereferred to as "first-clause" preemption (from the first clause of §1012(b)). This is contrasted with the second clause of §1012(b) which carves out a narrower exception from antitrust laws. *See, generally,* Appellant's Opening Brief at 17-22.

[4] This test comes from the first clause of 15 U.S.C. § 1012(b). The requirements are: (1) The state statute was enacted "for the purpose of regulating the business of insurance," (2) the federal statute does not "specifically relate to the business of insurance," and (3) the federal statute would "invalidate, impair, or supersede" the state statute."

[5] *Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185 (3rd Cir. 1998).

Also error, the Panel used §1012(a) to require that conduct under to a state insurance regulatory statute must "constitute the business of insurance". This is contrary to the text of §1012(a): "**(a) State regulation**. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." Nowhere in §1012(a) is conduct mentioned. It simply provides that the business of insurance is subject to the laws of the States "which *relate to* the regulation . . . of such business." (emphasis added). Indeed, §1012(a), granting states authority over all laws which relate to the regulation (and taxation) of the business of insurance, is *broader* than those laws encompassed within the first clause of §1012(b). Those §1012(b) laws are a subset of the laws under §1012(a). They consist of laws which are saved from federal preemption because they were enacted *for the purpose of* regulating the business of insurance. As such, it is both a *non sequitur* and a perversion of statutory interpretation for §1012(a) to act as a screen for §1012(b). Any law "enacted for the purpose of regulating the business of insurance" will also constitute a law "relating to" the business of insurance. By using a narrow test to screen out laws that would satisfy the broader test of §1012(b), the funnel has been turned upside down.

Further, requiring that challenged conduct must constitute the "business of insurance" (particularly in the case of a regulatory statute) is contrary to Supreme Court precedent and other Panel decisions of this Circuit. Those cases found that

statutes enacted for the purpose of regulating the business of insurance necessarily encompass more than just the 'business of insurance," and the two cannot be equated.  By first adding a narrower threshold test the Panel did exactly what the Supreme Court and other Panels of this Court said cannot be done–write words out of the statute.  The Panel violated the tenet of statutory interpretation against construing a statute so as to render other portions superfluous, void or insignificant.

*Sabo* erred by creating a threshold under §1012(a) before the required application of §1012(b).  *Sabo* then deviated from §1012(a)'s text and imposed a "conduct" component to that threshold.  The Panel's decision determining that the Delaware statute did not "constitute the business of insurance" (Op. at 34-40) compounded these errors.  In so doing the Panel ignored Supreme Court and Third Circuit precedent requiring conduct to be "broadly" construed, and disregarded even *Sabo*'s holding that it is only when the activities are "wholly unrelated to the insurance business" that the "threshold test" prevents preemption.  The Panel violated this dictate by its extremely narrow characterization of the conduct at issue. Further, the Panel's insistence that the purpose of the statute cannot be considered in determining whether conduct under the statute constitutes the "business of insurance" is at odds with the text of §1012(a), leading to contra-textual results.

## ARGUMENT

I.   **The Panel's Decision is Contrary to Decisions of the Supreme Court, this Court, the Text of the McCarran-Ferguson Act and the Decisions of Other Circuit Courts**

A.   **The Panel Improperly Used 15 U.S.C. §1012(a) to Restrict the Reverse-Preemption Analysis Under the First Clause of §1012(b)**

1.   **The Panel's Decision Is Contrary to Decisions of the Supreme Court and this Court**

When discussing the test for non-antitrust reverse-preemption under the McCarran-Ferguson Act, the Supreme Court and all decisions of this Court other than *Sabo* and *Highmark* use a three-factor test that tracks the statutory language of the first clause of 15 U.S.C. §1012(b):[6]  *Humana, Inc. v. Forsyth*, 525 US 299, 307 (1999); *U.S. Dep't of Treasury v. Fabe,* 508 U.S. 491, 501 (1993); *Suter v. Munich Reins. Co*., 223 F.3d 150, 160 (3d Cir. 2000); *S. Jersey Sanit. Co., Inc. v. Applied Underwriters Captive Risk Assur. Co., Inc*., 840 F.3d 138, 142 fn 7 (3d Cir. 2016).

The Third Circuit's most recent decision, in 2016 states:  "Thus, "[u]nder [the M-FA], state laws reverse[-]preempt federal laws if (1) the state statute was enacted 'for the purpose of regulating the business of insurance,' (2) the federal statute does not 'specifically relate to the business of insurance,' and (3) the federal statute would

---

[6] "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . .."

'invalidate, impair, or supersede' the state statute." *S. Jersey Sanit. Co.,* 840 F.3d at 142 fn. 7 (quoting *Suter,* 223 F.3d at 160).

None of these cases suggest that there are additional silent factors used to analyze reverse-preemption under the McCarran-Ferguson Act. Both *Humana* and *S. Jersey Sanit Co.* present the test as being "under the McCarran-Ferguson Act." There is a clear conflict between the Panel's determination requiring a four-factor test, and the Supreme Court and other decisions of the Third Circuit requiring a three-part test.

The Panel's attempt to explain away *Sabo's* conflict with *Fabe* and *Humana,* the two Supreme Court cases that clearly enunciate the three-part test as the only test to be applied in §1012(b) first-clause cases, is neither proper nor persuasive. The Panel reasoned that *Fabe* "never foreclosed §1012(a) from playing the role we have concluded it plays" (Op. at 27) and that *Humana* "touched only on the first clause of §1012(b) without suggesting a rejection of a threshold inquiry under §1012(a)." Op. at 28. The Panel's suggestion that "Courts often assume satisfaction of some analytical steps, where appropriate, to get to the heart of the matter," falls flat where (as pointed out by the Panel), in each of *Fabe, Humana* and *Suter* the courts did not need to decide all three of the factors because of agreements of parties, or assumptions. Op. at 27-29, 31-32. Nevertheless, each recited ***all three factors and no others***.

It is extreme to read *Humana*'s declaration that "***The McCarran–Ferguson Act*** thus precludes application of a federal statute"[7] immediately followed by only three factors as incomplete. The Panel's decision requires accepting that the majority and dissent in *Fabe*, despite battling over the meaning of "the business of insurance", either missed the significance of §1012(a) to that debate or purposefully ignored it. It likewise requires that the *Humana* Court, despite reviewing a decision which included the fourth factor ("the acts challenged under the statute constitute the business of insurance")[8] and a Respondent's Brief asserting that same factor,[9] decided to ignore that fourth factor when listing the factors that allow reverse-preemption under the Act.

The Panel's reasoning was apparently also lost on the Fifth Circuit, which described *Humana*'s holding as "extremely clear and specific language" identifying the "three MFA preemption threshold requirements." *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 294–95 (5th Cir. 2003). It was likewise lost on each of the courts in other Circuits discussed in Section I(B) below, which continue to enunciate the three-part test.

---

[7] 525 U.S. at 307 (emphasis added).

[8] *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1479 (9th Cir. 1997), *aff'd,* 525 U.S. 299 (1999).

[9] *Humana, Inc. v. Forsyth*, 1998 WL 644660 (U.S.), 9 n.13 (U.S. Resp. Brief, 1998).

Because the Panel's decision that §1012(a) forms a threshold test for McCarran-Ferguson Act reverse-preemption conflicts on its face with cases from the Supreme Court and other cases from this Circuit, en banc review is necessary.

### 2.   The Panel's Decision Is Contrary to the Text of 15 U.S.C. §1012(a)

The Panel, relying solely on *Sabo,* determined that §1012(a) requires courts to make a threshold determination as to "whether the ***conduct at issue broadly constitutes*** the 'business of insurance.'"  Op. at 19-20 (citing *Sabo*, 137 F.3d at 189)(emphasis added).

Imposing a threshold based on whether "conduct" "constitutes the business of insurance" is entirely absent from the text of §1012(a), which provides:

> **a) State regulation**. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

Nothing in §1012(a) suggests that "conduct" should be considered, much less that such conduct must "constitute the business of insurance."

*Sabo'*s leap to "conduct" is completely untethered to §1012(a)'s text.  *Sabo* recognizes that "Of these state 'laws relat[ing] to the regulation or taxation' of the insurance business, 15 U.S.C. §1012(a), the next subsection [§1012(b)] protects from federal preemption a special class of state laws 'enacted ... for the purpose of regulating the business of insurance.'"  137 F.3d at 190.  *Sabo* acknowledges that

"The focus of section 1012(b) is not directed toward the business of insurance itself, but rather toward *a certain subset of laws* relating to insurance regulation under section 1012(a)." *Id.,* at 191 (emphasis added).

*Sabo* reasoned that "even though the state has a law regulating the challenged activity, a court must still address whether that law was meant to fall within the ambit of the Act's protection." However, *Sabo'*s analysis errs when it ignores the text of §1012(a) and replaces it with a factor used only in antitrust cases. *Sabo* concludes, without explanation or support, "[whether a state law was meant to fall within the McCarran-Ferguson Act's ambit] is achieved by deciding whether the activity in question constitutes the business of insurance…." *Id.*

*Sabo*'s leap is especially jarring given its recognition that §1012(a)'s mandate is "state 'laws relat[ing] to the regulation or taxation' of the insurance business." *Id.* at 190. Any test under §1012(a) must comply with the text. That test could only be whether the state law (18 *Del. C.* §6920) "relates" to the regulation of the insurance business.

The Supreme Court, in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), discussed the word "relates" when discussing another factor of the reverse-preemption test, whether a federal statute "specifically relates to the business of insurance," (*Id.* at 38) explaining: "[t]he word 'relates' is highly general, and this Court has interpreted it broadly in other preemption contexts." *Id.* By necessity,

laws "relating" to the "business of insurance" go far beyond "the business of insurance."

   *Sabo*'s misuse of §1012(a) is evident from *Fabe's* holding on the scope of "the business of insurance" which has been repeated by this Circuit both before and after *Sabo*. *Fabe* distinguished cases under the antitrust exception contained in the second clause.   That antitrust test formulation required, *inter alia*, an initial determination that challenged conduct must constitute "the business of insurance."[10] The *Fabe* Court first determined that the conduct at issue constituted "the business of insurance," even utilizing factors used by courts construing the second clause. *Id.* at 503-04.   However, *Fabe* then proceeded to distinguish and explain that, rather than dealing with the second clause of §1012(b), "[w]e deal here with the ***first*** clause, which is not so narrowly circumscribed." *Id.* at 504 (emphasis in original).   The Court contrasted the formulations:

> The language of §2(b) is unambiguous:  The first clause commits laws "enacted ... for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws.  To equate laws "enacted ... for the purpose of regulating the business of insurance" with the "business of insurance" itself, as petitioner urges us to do, would be to read words out of the statute.  This we refuse to do.

---

[10] The test is given in the Opinion at footnote 9.  As opposed to the test for the first clause, each of the factors for the second clause relates to "the activities."

*Id.*

Acknowledging this distinction, the Court held that "[t]he broad category of laws enacted for the purpose of regulating the business of insurance consist of laws that possess the end, intention or aim of adjusting, managing or controlling the business of insurance." *Id.* at 505 (citation and quotation marks omitted).  As such, the Court explained that "[t]his category necessarily encompasses more than just the 'business of insurance." *Id.*

A month after *Fabe*, the Third Circuit reiterated *Fabe*'s distinction that "the business of insurance" covers more than "enacted for regulating the business of insurance" and that equating the two "would be to read words out of the statute." *Ticor Title Ins. Co. v. F.T.C.,* 998 F.2d 1129, 1136–37 (3d Cir. 1993) (*citing Fabe*, 508 U.S. 504-505).

The Third Circuit later emphasized this distinction in *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).  There, the Court reviewed the history of the Act, and the difference between first and second clause claims under §1012(b). *Id.* at 351-361.  The Court again reiterated *Fabe*'s caution that though both clauses incorporate the phrase "business of insurance," "the broad category of laws enacted 'for the purpose of regulating the business of insurance' ... necessarily encompasses more than just the business of insurance."  618 F.3d at 360 (citations and quotes omitted).  The Court explained that there were actions which were not "the business

of insurance" but laws regulating those actions were "enacted for the purpose of regulating the business of insurance." *Id.* at 360–61.

Just as laws enacted for the purpose of regulating the business of insurance encompasses more than just the business of insurance, laws ***relating to*** the business of insurance (in §1012(a)) encompass more than just laws enacted for the purpose of regulating the business of insurance.  Schematically this can be shown as:



As shown above, the analytical structure of the Act, can be viewed as a funnel, broad at the top at §1012(a), narrower when analyzing reverse-preemption under the first clause of §1012(b), and most narrow when using reverse-preemption under the

second clause of §1012(b) (antitrust). Using "conduct that constitutes the business of insurance"—an analytical concept only relevant in the narrowest anti-trust consideration under the second clause of §1012(b) —is improper because it inverts the "funnel" by excluding the many topics which are "more than just the business of insurance" contained in "laws enacted for the purpose of regulating the business of insurance". In so doing, *Sabo* and the Panel did exactly what *Fabe, Ticor Title* and *In re Ins. Brokerage Antitrust Litig.* prohibited—wrote words out of the statute. This error violates a fundamental tenant of statutory construction: interpretations should not render portions of the statute superfluous, void or insignificant. *See B & G Constr. Co., Inc., v. Officer of Workers' Comp. Programs*, 662 F.3d 233, 248-49 (3d Cir. 2011) (citing *Market Co. v. Hoffman*, 101 U.S. 112, 115-16 (1879)). It is thus unsurprising that this error of statutory discernment yields a result directly contrary to the statute's intent. The McCarran-Ferguson Act is rendered unrecognizable and irreconcilable with its purpose, its text and the decisions of all other courts that have grappled with its proper application.

### B. The Decision of the Panel Is Contrary to Decisions of the Other Circuit Courts of Appeal Considering the Issue

The Panel referenced two points that "might provide a basis for en banc review…First, [the Department] notes that we are alone in holding that there is a threshold inquiry derived from §1012(a). Second, it contends that each of the other Circuits that previously used a four-factor test have abandoned it." Op. at 32.

However, despite that both are inarguably true, the Panel found neither "persuasive." *Id*.

The Panel provided no explanation regarding the first point, which was conceded by the IRS. IRS Opening Br. at 23-24 ("The Third Circuit appears to be the only federal appellate court to have addressed whether §1012(a) creates an additional obstacle to reverse preemption").

The Panel was not persuaded by the second point because "[t]he Department identifies no post-*Humana* precedential opinion of our sister circuits that engages in legal analysis grappling with (let alone dispensing with) something akin to *Sabo*'s threshold inquiry under §1012(a)." Op. at 32-33. By this explanation, the Panel confirms that the *Sabo* §1012(a) analysis is unique. As discussed in Section I(A)(2)above, this is not a surprise. The reason is obvious: §1012(a) does not narrow the §1012(b) first-clause reverse-preemption analysis.

The fact remains, as discussed at pages 17-19 and 23-24 of the Department's Reply Brief, that prior to *Fabe* and *Humana*, several courts utilized a fourth factor, **_identical_** to that used by *Sabo* and the Panel. This factor was uniformly sourced in §1012(b) and was borrowed from the test for the exception to reverse-preemption for antitrust cases contained in the second clause of §1012(b).[11] *Id*. As discussed at

---

[11] That test is set forth in the Opinion, footnote 9, p 19.

pages 26-27 of the Department's Opening Brief, every Circuit which has since decided the issue has now adopted the three-part test, citing either *Fabe* or *Humana* as support for that test.

The Third Circuit's analysis stands alone. It requires an unsupported proposition that the Supreme Court omitted a factor when declaring the test for McCarran-Ferguson reverse-preemption, and that no other circuit has even considered the applicability of §1012(a) to the analysis in the twenty-five years after *Sabo*.

## II.   The Panel Erred In Determining that the Delaware Statute Did Not Constitute the "Business of Insurance"

Even assuming *arguendo* that *Sabo* was correctly decided, the Panel erred in determining that the conduct at issue did not constitute the business of insurance. The Panel erroneously removed all context when characterizing the relevant conduct as "non-disclosure of records maintained by the State absent a confidentiality agreement" (Op. at 34), or "the Department's refusal to provide documents and testimony responsive to Request 1 of the summons." Op. at 36. This   error   is manifest from the opening line of the Opinion: "This case pits Delaware's authority to protect ***corporate*** privacy against the power of the IRS to enforce the tax laws of the United States." Op. at 1 (Emphasis added).

In doing so, the Panel ignores the instructions of *Sabo* that it must consider "whether the challenged conduct ***broadly*** constitutes the 'business of insurance in

the first place*." (Sabo*, 137 F.3d at 190) (Emphasis added).  This is so because "[i]f the contested activities are ***wholly unrelated*** to the insurance business, then the McCarran-Ferguson Act has no place in analyzing federal regulation because only when '[insurance companies] are engaged in the 'business of insurance' does the act apply.'" *Id.* (*citing Sec. & Exch. Comm'n v. Nat'l Sec., Inc.,* 393 U.S. 453, 459-60 (1969)) (emphasis added).

The Panel rejected consideration of the background or purpose of the statute, asserting such was not done in *Sabo* or *Highmark*.  Op. at 35-36.  This is doubly incorrect.  First, both *Sabo* and *Highmark* delve into the context and intent of the insurance statute.  In *Sabo*, the Court stated that what was considered to determine whether conduct was the business of insurance was to "look to the defendants' conduct to ascertain whether it centers around the contract of insurance and the relationship between the insurer and insured."  137 F.3d 185.  *Highmark* looked at the type of conduct – advertising of insurance products, and determined that advertising was the business of insurance based on two prior Supreme Court decisions.  276 F.3d at 166-167 (citing *Fed. Trade Comm'n v. Nat'l Cas. Co.*, 357 U.S. 560, 562–63, (1958); *Nat'l Sec., Inc.*, 393 U.S. at 460).

Second, the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Travers v. Federal Express Corp.*, 8 F.4th 198, 200 (3d Cir. 2021).  Context is especially required when the question is

whether conduct "broadly" constitutes the business of insurance or is "wholly unrelated" to the business of insurance. The Supreme Court had held that "licensing of insurance companies [is a] clear example[] of the 'business of insurance.'" *Nat'l Sec., Inc.*, 393 U.S. at 460; *See also Owens v. Aetna Life & Cas. Co.*, 654 F.2d 218, 244 (3d Cir. 1981); *Sabo*, 137 F.3d at 190.

The District Court's finding of fact included that "Section 6920 of the Delaware Insurance Code ("Section 6920") relates to the confidential treatment of materials and information that captive insurers submit to the state tax [sic] commissioner, either directly or through DDOI, as part of the application and licensing process." (Appendix at A010). Given this, the conduct at issue is whether the Insurance Commissioner can be forced to produce documents provided in the application and licensing process without a confidentiality agreement. The background, as explained in Appellant's Opening Brief at 36-40, is that such confidential treatment is a requirement among states and necessary for interstate cooperation and to encourage insurers to providing departments complete information.

As such, just as the connection to "advertising" in *Highmark* was the business of insurance for purposes of the threshold, so too is §6920, as part of the licensing process. Broadly construed, it is certainly not "wholly unrelated" to the business of insurance.

As this Court has cautioned, "the precise characterization of the defendants' conduct can be dispositive." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 356 (discussing whether conduct was the "business of insurance" in a case based on antitrust exemption). *See also, Ticor Title,* 998 F.2d at 1142 (Alito, dissenting) (same). The Panel's reasoning that the purpose of insurance laws cannot be considered leads to absurd results, such as the Panel's characterization that strips out all reference to insurance. Thus, vast swathes of insurance law would be stripped of McCarran-Ferguson protection. Such a results turn the McCarran-Ferguson Act on its head.

## CONCLUSION

The Delaware Department of Insurance requests that this Court grant rehearing or rehearing en banc.

Respectfully Submitted,

KATHLEEN P. MAKOWSKI
Deputy Attorney General
1007 Orange Street, Suite 1010
Wilmington, DE  19801
(302) 674-7326
Kathleen.Makowski@Delaware.gov


PATRICIA A. DAVIS
Deputy State Solicitor
102 W. Water Street
Dover, DE 19904
(302) 257-3233
PatriciaA.Davis@Delaware.gov

/s/ *James J. Black, III*
JAMES J. BLACK, III
JEFFREY B. MICELI
MARK W. DRASNIN
Black & Gerngross, P.C.
1617 John F. Kennedy Blvd.
Suite 1575
Philadelphia, PA 19103
(215) 636-1650
jblack@blackgern.com
jmiceli@blackgern.com
mdrasnin@blackgern.com
*Counsel for Respondent-Appellant*
Delaware Department of Insurance

## COMBINED CERTIFICATIONS

1.    **Bar Membership:**  In accordance with L.A.R. 28.3(d), I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.    **Word Count:**  I hereby certify that the Petition for Rehearing and Rehearing En Ban of Appellant Delaware Department of Insurance ("this Petition") complies with the typeface requirements of Fed. R. App. P. 32 because the Petition has been prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.  Further, this Brief also complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this Petition contains 3,883 words, excluding those parts excluded by Fed. R. App. P. 32(f), calculated by using the word count function of Microsoft Word and adding the words contained in the included diagram.

3.    **Virus Scan:**  The electronic copy of this Brief was scanned for electronic viruses on June 5, 2023 before transmission to this Court using the Avast Business Antivirus software version 23.4.2751 and no viruses were detected.

4.    Pursuant to Local Rule 35.2(a), no paper copies of this brief will be provided unless directed by the Clerk.

5.  **Service:**  On June 5, 2023, I electronically filed the foregoing brief with the Clerk for the Court of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF System.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*Counsel for Petitioner/Appellee United States of America*

Dated:  June 5, 2023

/s/ *James J. Black, III*
James J. Black, III
Black & Gerngross, P.C.
1617 John F. Kennedy Blvd.
Suite 1575
Philadelphia, PA  19103
Telephone: (215) 636-1650
Telecopier: (215) 636-0268
Email: jblack@blackgern.com

# ADDENDUM

# (Judgment and Opinion dated 4/21/23)

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-3008

_____

UNITED STATES OF AMERICA

v.

STATE OF DELAWARE DEPARTMENT OF INSURANCE,
Appellant

_____

On Appeal from the United States District Court
For the District of Delaware
(D.C. No. 1-20-cv-0829)
District Judge:  Honorable Maryellen Noreika

_____

Argued
November 8, 2022

Before:   JORDAN, SCIRICA, and RENDELL, *Circuit Judges*

_____

JUDGMENT

_____

This cause came to be considered on the record from the United States District
Court for the District of Delaware and was argued on November 8, 2022.  On
consideration whereof,

It is now hereby ORDERED and ADJUDGED that the Judgment of the District Court entered on September 29, 2021, is hereby Affirmed.  All of the above in accordance with the opinion of this Court.  Each party to bear its own costs.

ATTESTED:

s/Patricia S. Dodszuweit
Clerk

DATE: April 21, 2023

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3008
_____

UNITED STATES OF AMERICA

v.

STATE OF DELAWARE DEPARTMENT OF
INSURANCE,

               Appellant
_____

On Appeal from the United States District Court
For the District of Delaware
(D.C. No. 1-20-cv-0829)
District Judge:  Honorable Maryellen Noreika
_____

Argued
November 8, 2022

Before:  JORDAN, SCIRICA, and RENDELL, *Circuit
Judges*

(Filed April 21, 2023 )
_____

James J. Black, III   [ARGUED]
Mark W. Drasnin
Jeffrey B. Miceli
Black & Gerngross
1617 John F. Kennedy Blvd.
Suite 1575
Philadelphia, PA   19103

Patricia A. Davis
Office of Attorney General of Delaware
Delaware Department of Justice
102 West Water Street – 3rd Floor
Dover, DE   19904

Kathleen P. Makowski
Office of Attorney General of Delaware
Department of Justice
820 N. French Street – Suite 1010
Wilmington, DE   19801
        *Counsel for Appellants*

Travis S. Hunter
Richards Layton & Finger
920 N. King Street
One Rodney Square
Wilmington, DE   19801
        *Counsel for Amicus Appellants*

Ward W. Benson
Kyle L. Bishop
United States Department of Justice
Tax Division
P.O. Box 227
Ben Franklin Station
Washington, DC   20044

Michael J. Haungs
Lauren E. Hume
Francesca Ugolini   [ARGUED]
United States Department of Justice
Tax Division
950 Pennsylvania Avenue
P.O. Box 502
Washington, DC   20044
     *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge.*

     This case pits Delaware's authority to protect corporate privacy against the power of the IRS to enforce the tax laws of the United States.  The dispute arises from the refusal of the Delaware Department of Insurance (the "Department") to comply with an IRS summons.  The Department relies on Title 18, Section 6920 of the Delaware Code, which generally prohibits the Department from disclosing certain information about captive insurance companies to anyone, including the

federal government, absent the companies' consent.[1]  But § 6920 does allow disclosure to the federal government if it agrees in writing to keep the disclosed information confidential.  The government did not and instead petitioned the District Court to enforce its summons.  The Court granted that petition.  The Department argues that, under the McCarran-Ferguson Act ("MFA"), 15 U.S.C. § 1011 et seq., Delaware law as embodied in § 6920 overrides the IRS's statutory authority to issue and enforce summonses, so the District Court's order should be reversed.

While the MFA does protect state insurance laws from intrusive federal action when certain requirements are met, the District Court concluded that, before any such reverse-preemption occurs, our precedent requires that the conduct at issue – in this case, the refusal to produce summonsed documents – must constitute the "business of insurance" within the meaning of the MFA.  **[J.A. at 008, 012-17, 024-33.]**  The District Court held that this threshold requirement was not met here, and we agree.  We will therefore affirm.

## I.    BACKGROUND

### A.    Origin of the McCarran-Ferguson Act and Its Relevant Text

The MFA was Congress's response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944).  Before that

---

[1] A captive insurance company is an insurance company that is wholly owned and controlled by its insureds.  *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 176 (T.C. 2017).

decision, "it had been assumed that '[i]ssuing a policy of insurance [wa]s not a transaction of commerce,' subject to federal regulation." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 499 (1993) (quoting *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183 (1869)). That changed when *South-Eastern Underwriters* held that "insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws in particular[] were applicable to them." *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 458 (1969).

Fearing that *South-Eastern Underwriters* would "undermine state efforts to regulate insurance," Congress enacted the MFA. *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999). Relevant to our inquiry today are the provisions of the statute codified at §§ 1011 and 1012 of Title 15 of the United States Code.[2] The first, denominated "Declaration of policy," states:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011. Then, § 1012 provides:

---

[2] All references herein to the MFA are to its provisions as codified.

**(a) State regulation**

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

**(b) Federal regulation**

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012.

The Supreme Court later, in *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408 (1946), "explained the legislative intent behind the statute's preclusionary approach to federal intrusion on state insurance laws." *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 189 (3d Cir. 1998). It said, among other things, that Congress's "purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co.*, 328 U.S. at 429.

Those closing words – "the business of insurance" – have high salience in this dispute over captive insurance companies.

## B.    Overview of Captive Insurance

A "captive" insurance company is one that is wholly owned and controlled by its insureds. *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 176 (T.C. 2017). This type of entity protects the owner-insured while simultaneously allowing the benefit of reaping the captive company's underwriting revenues. Businesses that are experienced in establishing and managing captive insurance companies are called "captive managers." (J.A. at 241 at ¶ 14.) Captive managers facilitate the creation and management of captive insurers in jurisdictions that have passed captive insurance enabling legislation, as has Delaware.

Captive insurance is effectively a kind of self-insurance, but one with an added tax benefit: "Amounts paid for insurance are deductible under [26 U.S.C. § 162(a)] as ordinary and necessary expenses paid or incurred in connection with a trade or business[,]" as opposed to "amounts set aside in a loss reserve as a form of self-insurance," which are not deductible. *Avrahami*, 149 T.C. at 174. The upshot is that a company that wishes to hold money aside in case of loss can reduce its taxable income by paying such money as premiums to its captive insurer and then deducting the premiums.

Title 18 of the Delaware Code (the "Delaware Insurance Code") governs insurers and insurance professionals licensed under Delaware law. Chapter 69 of the Delaware Insurance Code is the part of the state's statutory scheme governing the formation, licensing, and regulation of captive insurers. Under

Chapter 69, corporations and various alternative entities can apply for certificates of authority from the Insurance Commissioner of the State of Delaware to operate as captive insurance companies.[3]  If a certificate is granted, the resulting Delaware captive insurance company is generally subject to triennial examinations in which the Department "thoroughly inspect[s] and examine[s] [the company's] affairs to ascertain its financial condition, its ability to fulfill its obligations and its compliance with the provisions of [Chapter 69]." 18 Del. Code Ann. § 6908.

Section 6920 of the Delaware Insurance Code, which is central to the present controversy, relates to the confidential treatment of materials and information that captive insurers are required to submit to the Department.  It provides, in pertinent part:

> All portions of license applications reasonably designated confidential by … an applicant captive insurance company, … and all examination reports, … recorded information, [and] other documents, … produced or obtained

---

[3] A would-be captive insurance company may apply for a "certificate of authority" from the Commissioner, as provided in 18 Del. Code Ann. § 6903 ("License application; certificate of authority").  Once issued a "certificate of authority," a captive insurance company is "authoriz[ed] … to do insurance business in th[e] State."  *Id*. § 6903(f).  The terms "Commissioner" and "the Department" will be used herein interchangeably, as there is no issue in this case relating to delegation of the Commissioner's authority.

by or submitted or disclosed to the
Commissioner that are related to an examination
pursuant to this chapter must, unless the prior
written consent … of the captive insurance
company … has been obtained, be given
confidential treatment …, and may not be …
disclosed to any other person at any time except:

> ….

> To a law-enforcement official or agency
> of … the United States of America so long
> as such official or agency agrees in
> writing to hold it confidential and in a
> manner consistent with this section.

§ 6920.

In short, § 6920 prohibits the Department from
disclosing covered information to anyone, including the
federal government, unless the captive insurance company
consents, or, as relevant here, the federal government agrees in
writing to treat the information as confidential.

## C. Overview of "Micro-Captive" Insurance and Tax Concerns

As mentioned above, captive insurance can be used to
obtain a tax benefit for the insureds by permitting them to claim
deductions for the premiums they pay. But that does not
prevent the IRS from taxing the captive insurers. "While the
[Internal Revenue] Code permits the deduction of insurance
premiums *paid*, it also taxes insurance premiums *received*."
*Avrahami*, 149 T.C. at 174 (emphasis in original); *see also id.*

at 175 ("Insurance companies – other than life-insurance companies … – are generally taxed on their income in the same manner as other corporations.").

There is, however, an exception of particular relevance here: insurance companies whose annual net written premiums do not exceed a specified maximum and meet certain other requirements may elect tax treatment under 26 U.S.C. § 831(b).[4] *See id*. at 176, 178-79 & n.46. That election allows a captive insurance company to pay <u>no</u> taxes on the premiums it receives. *IRS Notice of Transaction of Interest – Section 831(b) Micro-Captive Transactions* ("2016 IRS Notice"), 2016-47 I.R.B. 745 (2016). Instead, it only pays tax on any eligible investment income it may have. *Id*.; *see also Avrahami*, 149 T.C. at 176 (explaining that such an entity is "subject to tax only on its taxable investment income"). In that

---

[4] That section generally provides that instead of paying taxes computed using their taxable income, insurance companies that have elected this treatment have their "tax computed by multiplying" their "taxable investment income" "by the rates provided in [26 U.S.C.] section 11(b)." 26 U.S.C. § 831(b)(1) (setting the general tax consequence for certain small insurance companies). The 2015 amendments to 26 U.S.C. § 831(b) set the threshold at $2.2 million and provided that this will periodically be "increased for inflation." *Avrahami*, 149 T.C. at 176 n.46. The federal government represents that as of the time it filed its Answering Brief, the maximum still stands at $2.2 million. The 2015 amendments to 26 U.S.C. § 831(b) "added new diversification requirements that an insurance company must meet in order to receive the favorable tax treatment of subsection (b)." *Id.*

circumstance, then, the insured can deduct premiums from its taxable income without its captive insurer being taxed on those same premiums.

Insurance companies that are both "captive insurers" and taxed under 26 U.S.C. § 831(b) are known as "micro-captives." The term "micro-captive" does not appear anywhere in the Delaware Captive Law or the Internal Revenue Code. It is simply an apt description used by the IRS and the Tax Court, among others, to designate a captive insurance company whose annual net written premiums do not exceed the maximum allowed for it to elect the special tax treatment available under § 831(b). *See Avrahami*, 149 T.C. at 176, 178-79 (discussing such companies and transactions, their tax consequences, and their potential for abuse).

While the IRS has explicitly "recognize[d] that related parties may use captive insurance companies that make elections under § 831(b) for risk management purposes that do not involve tax avoidance," it has identified "micro-captive" transactions as having "a potential for tax avoidance or evasion." 2016 IRS Notice, 2016-47 I.R.B. 745. For example, "[u]nscrupulous promoters" may "persuade closely held entities to … create captive insurance companies onshore or offshore, drafting organizational documents and preparing initial filings to state insurance authorities and the IRS." IRS News Release IR-2015-19 (Feb. 3, 2015), https://www.irs.gov/pub/irs-news/IR-15-019.pdf. Too often, these micro-captives are not providing bona fide insurance. "Underwriting and actuarial substantiation for the insurance premiums paid are either missing or insufficient." *Id*. Instead, their purpose is to serve as a conduit for inflated premiums that their insureds can deduct as business expenses, while the faux

insurer, by keeping the premiums below the threshold for § 831(b), is taxed only on the investment income it may have. *Id*. The promoters help paper over the charade and may "assist[] with creating and 'selling' to the entities often times poorly drafted 'insurance' binders and policies to cover ordinary business risks or esoteric, implausible risks for exorbitant 'premiums[.]'" *Id*. All the while, the insured may retain actual commercial insurance coverage from traditional insurers. *Id*.

Accordingly, "the IRS has applied increased scrutiny to these transactions, adding them to [its] 'dirty dozen' list of tax scams in 2015 and declaring them 'transactions of interest' in 2016." *Avrahami*, 149 T.C. at 173. A 2016 IRS Notice declared micro-captive transactions satisfying certain criteria as "transactions of interest" that must be reported to the IRS. IRS Notice, 2016-47 I.R.B. 745.

### D.     Factual Background

The summons enforcement action now on appeal arises from the IRS's investigation of Artex Risk Solutions, Inc. ("Artex"), and Tribeca Strategic Advisors, LLC ("Tribeca"), the latter entity being wholly owned by Artex. The investigation seeks to determine whether Artex and Tribeca are liable for penalties under 26 U.S.C. § 6700 for promoting abusive tax shelters.[5] The federal government successfully enforced two summonses issued to Artex, leading to a production of documents in 2014. Those documents included

---

[5] The origins of that investigation are immaterial to the issues before us now.

two email chains between Artex and the Delaware Department of Insurance that piqued the interest of the IRS and led to the summons at issue here. The first email chain related to the issuance by the Department of certificates of authority in December 2012 to an Artex client. The second involved the Department's Director of Captive and Financial Insurance Products, who declined a dinner invitation from Artex but scheduled a breakfast meeting the following day with six Department employees and Artex.

On October 30, 2017, the IRS issued an administrative summons to the Department for testimony and certain records relating to filings by and communications with Artex, Tribeca, or others working with those companies. Of main concern is what the parties and District Court refer to as "Request 1" of the summons. Request 1 seeks "all electronic mail between [the Department] and Artex and/or Tribeca related to the Captive Insurance Program." (J.A. at 065.) The "Captive Insurance Program" is broadly defined in the summons as "any arrangement managed by Artex or Tribeca wherein captive insurance companies, defined by [Chapter 69 of the Delaware Insurance Code], provide either insurance and/or reinsurance." (J.A. at 063.) At the time of the summons, it seems the IRS believed that the Department had issued 191 certificates of authority to insurance companies created by Artex and Tribeca.[6] It directed the Department to appear before a revenue agent to give testimony and produce requested documents by November 29, 2017.

---

[6] The Department has represented that it actually issued 225 certificates of authority to companies created by Artex and Tribeca.

The Department responded with objections to the summons, including confidentiality objections pursuant to § 6920 of the Delaware Insurance Code. The IRS declined the Department's request to agree in writing to abide by the confidentiality requirements of § 6920. The Department has thus continued to refuse to produce any emails or other documents responsive to Request 1 that relate to specific captive insurers created by Artex and Tribeca, absent the affirmative consent of the relevant captive insurers, and no representative of the Department has ever appeared to provide testimony. Any limited compliance with the summons was tailored to avoid violating § 6920 and does not bear on the issues before us.

### E.    Procedural Background

Given the Department's refusal to comply with the summons, the federal government filed in the District Court a petition to enforce it, supported by a declaration from IRS Revenue Agent Bradley Keltner. Specifically, the government sought an order directing the Department to comply with Request 1 of the summons and the demand for testimony. A Magistrate Judge, the Honorable Christopher J. Burke, issued an order to show cause why the Department should not be compelled to comply with the summons. The Department opposed the petition for enforcement and moved to quash the summons. Of importance here, the Department argued that, under the MFA, § 6920 reverse-preempts the IRS's summons authority.[7]

---

[7] To make out a prima facie case for the validity of a summons, the federal government must show each of the following: (1) "that the investigation will be conducted

The Magistrate Judge issued a thorough Report and Recommendation concluding that the petition to enforce the summons should be granted. He recommended against any holding of reverse-preemption under the MFA, after analyzing the question at length. First, he explained how MFA reverse-preemption is "an exception to the general rule" that a "state statute yields under the doctrine of preemption" in the face of a conflicting federal statute. (J.A. at 025.) Specifically, he explained that, unlike the normal situation, the MFA "permits state laws to trump federal laws in certain circumstances (or to 'reverse preempt' those laws)." (J.A. at 025.) Further, he described how the MFA's reverse-preemption provision, codified in § 1012(b), contains two clauses, with the first

---

pursuant to a legitimate purpose"; (2) "that the inquiry may be relevant to the purpose"; (3) "that the information sought is not already within the [IRS's] possession"; and (4) "that the administrative steps required by the [United States Tax] Code have been followed." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1262 (3d Cir. 1990) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)) (internal quotation marks omitted). Before Judge Burke, the Department argued the third prerequisite had not been shown. He decided that the federal government had met its burden on the challenged *Powell* factor and that the Department had not rebutted it. The Department did not object to that finding, which also underpins the District Court's decision based on the Report and Recommendation of Judge Burke. Likewise, the Department has not raised that point on appeal and thus it is forfeited. *See Geness v. Cox*, 902 F.3d 344, 355 (3d Cir. 2018) (explaining that an appellant forfeits an argument in support of reversal if it is not raised in the opening brief).

addressing "federal laws in general," and the second addressing "application of federal antitrust laws." (J.A. at 025 (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 167 n.1 (3d Cir. 2001)).)

The Magistrate Judge then said that in a non-antitrust matter, such as this case, the first clause of § 1012(b) asks three questions (the "first clause requirements") that must be answered in the affirmative before reverse-preemption is appropriate under the MFA. Those questions are: "(1) whether the state law is enacted 'for the purpose of regulating the business of insurance'; (2) whether the federal law does not 'specifically relat[e] to the business of insurance'; and (3) whether the federal law would 'invalidate, impair, or supersede' the State's law." (J.A. at 026 (citing *Humana*, 525 U.S. at 307).)

Argued by the federal government, the Magistrate Judge went on to say "that before the Court applies the above-referenced three-factor test drawn from [§ 1012(b)], it must first assess whether an additional, threshold element … has been met: 'whether the activity complained of constitutes the "business of insurance."'" (J.A. at 026 (emphasis removed) (quoting *Highmark*, 276 F.3d at 166 (quoting *Sabo*, 137 F.3d at 191)).) He observed that our precedent has "clearly and repeatedly instructed that … [courts] must first assess whether the movant has satisfied the threshold element, before applying [§ 1012(b)]'s three-part test." (J.A. at 028.) Further, he rejected the argument that, based on the Supreme Court's decisions in *U.S. Department of Treasury v. Fabe*, 508 U.S. 491 (1993), and *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), our threshold "business of insurance" inquiry is no longer good law.

With that said, the Magistrate Judge recommended the conclusion that, under our threshold inquiry, the challenged conduct did not constitute the "business of insurance" and so was not subject to the reverse-preemption provision of the MFA. He suggested that, in determining whether the reverse-preemption provision in § 1012(b) applies, courts should look at the discrete conduct in question (here, resisting an IRS summons, as dictated by § 6920), rather than examining how the ostensibly reverse-preempting provision of state law fits into the State's overarching regulatory scheme. He agreed with the federal government that the conduct at issue in this case is "fairly characterized as '[r]ecord maintenance' or 'the dissemination and maintenance of information, documents, and communications [maintained by the state.]'" (J.A. at 029 (quoting D.I. 23 at 12-23).) Parsing the language of § 6920, he determined that the "entire focus is on the type of access that [the Department] may or may not provide to third parties (including federal law enforcement officers) regarding a captive insurer's confidential information." (J.A. at 029.) He thus recommended concluding such conduct does not constitute the "business of insurance."

In sum, the recommended holding was that the MFA does not apply to the particular conduct of the Department now at issue and, accordingly, that the petition to enforce the IRS summons should be granted and the motion to quash should be denied. The Department filed timely objections to the Magistrate Judge's Report and Recommendation, and the District Court overruled them, adopting the Report and Recommendation, granting the petition to enforce the summons, and denying the motion to quash. This timely appeal followed.

## II.    DISCUSSION[8]

The Department argues, first, that our threshold inquiry is no longer good law and, second, that even if it remains good law, the District Court erred in saying it was not satisfied here. Both of those arguments proceed from a fundamental misreading of our precedent.  Accordingly, before turning to either argument, we review our holding in *Sabo v. Metropolitan Life Insurance Co.*, 137 F.3d 185 (3d Cir. 1998), and our reaffirmance of *Sabo* in *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001).

### A.    Our Threshold Inquiry Precedent

### 1.    Origin and General Principles

In *Sabo*, we interpreted subsections 1012(a) and 1012(b), as well as the import of the Supreme Court's discussion of the MFA in *SEC v. Nat'l Sec., Inc.* ("*National Securities*"), 393 U.S. 453 (1969).  We concluded that there is a "threshold question in determining whether the antipreemption mandate of . . . § 1012(b) applies," and that the

---

[8] The District Court had jurisdiction under 26 U.S.C. §§ 7604(a), 7402(b), and 28 U.S.C. §§ 1340, 1345.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review for clear error whether the factual prerequisites for enforcement of an IRS summons have been met, and we review questions of law de novo.  *United States v. Ins. Consultants of Knox, Inc.*, 187 F.3d 755, 759 (7th Cir. 1999).  The issue of reverse-preemption under the MFA is one of law.  *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 263 (3d Cir. 2007).

inquiry is "whether the challenged conduct broadly constitutes the 'business of insurance' in the first place." *Sabo*, 137 F.3d at 189-91. Only when that question is answered in the affirmative do the "three distinct requirements" from the first clause of § 1012(b) come into play. *Id*. at 189. For reverse-preemption to be appropriate, all three of those "first clause" requirements must be met: "(1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law."[9] *Id*.

In *Sabo*, we were at pains to demonstrate that the threshold inquiry – again, whether the challenged conduct constitutes the "business of insurance" – had a firm foundation in § 1012(a). The issue presented in *Sabo* was whether reverse-preemption under the MFA barred an insurance salesman from suing his former employer under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-68, when the "challenged predicate acts ar[o]se [out] of the defendant's

---

[9] This is the test applicable in all but antitrust cases. In antitrust cases, the second clause, or "antitrust clause," of § 1012(b) provides a statutory exemption from antitrust liability "for activities that (1) constitute the 'business of insurance,' [and] (2) are regulated pursuant to state law," so long as they "(3) do not constitute acts of 'boycott, coercion or intimidation,'" under § 1013(b). *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1133 (3d Cir. 1993). Antitrust issues are not in play here, but the distinction between antitrust and non-antitrust cases under the MFA is noteworthy because of the different treatment the two categories receive under § 1012(b).

insurance business." *Sabo*, 137 F.3d at 187. The parties' disagreement focused on "the scope of the 'insurance business' covered by [the MFA], and whether it applied to" the conduct at issue in the dispute. *Id*. at 187-88. That conduct was a churning scheme involving the fraudulent trading of insurance policies, the fraudulent advertising of insurance policies as a retirement savings plan, and the coercing of employees to engage in those acts. *Id*.

We decided that those activities constituted the "business of insurance," after analyzing the proper role and basis for the threshold inquiry. *Id*. at 188-92. We stated that "Section [1012(a)] by its terms, affirmatively subjects the business of insurance to state regulation." *Id*. at 189. We then explained that the MFA took the "further step of proscribing unintended federal interference of state insurance laws by a general mandate," quoting the requirements of the first clause of § 1012(b). *Id*. We noted that our preemption analysis would focus on "the first clause of section 1012(b)," rather than the second clause because the complaint was not "grounded in federal antitrust law." *Id*. at 189 n.1.

We then analyzed the interplay between § 1012(a) and § 1012(b), saying, "[i]f it is determined that the alleged conduct at issue broadly constitutes the 'business of insurance,' and is therefore subject to state regulation under section 1012(a), the next issue is whether the anti-preemption mandate of section 1012(b) precludes a federal cause of action." *Id*. at 189. We did not engraft an atextual limitation onto the requirements of the first clause of § 1012(b). Rather, citing *National Securities*, we made it clear that we were relying on the text of § 1012(a) for the threshold inquiry:

> The threshold question in determining whether the antipreemption mandate of 15 U.S.C. § 1012(b) applies is whether the challenged conduct broadly constitutes the "business of insurance" in the first place.  15 U.S.C. § 1012(a).  If the contested activities are wholly unrelated to the insurance business, then the [MFA] has no place in analyzing federal regulation because only when "[insurance companies] are engaged in the 'business of insurance' does the act apply."

*Id*. at 190 (quoting *National Securities*, 393 U.S. at 459–60).  We concluded by observing again that, "[i]f the defendant's conduct does not constitute 'the business of insurance,' then the Act simply does not apply and there is no need to confront preclusion issues under § 1012(b)."  *Id*.

Re-emphasizing the point, and, relying on another Supreme Court opinion, *U.S. Department of Treasury v. Fabe*, we noted that reverse-preemption applies when "the activity in question constitutes the business of insurance and … the specific state law was enacted with the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance."  *Sabo*, 137 F.3d at 191 (quoting *Fabe*, 508 U.S. at 505).[10]

---

[10] The phrase "the specific state law was enacted with the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance" derives from the Supreme Court's construction of the phrase: "for the purpose of regulating the business of insurance."  *See Fabe*, 508 U.S. at 505 ("The broad category of laws enacted 'for the purpose

After *Sabo*, we reaffirmed the threshold inquiry in *Highmark*. "If the activity does not constitute the 'business of insurance,' then the [MFA] does not apply," we said.[11]  276 F.3d at 166 (citing *Sabo*, 137 F.3d at 190-91). If, however, the threshold inquiry is satisfied, "we then look to whether § 1012(b)" reverse-preempts the federal law in question. *Id.*

### 2.     The Breadth of the Phrase "Business of Insurance"

The Supreme Court has provided further guidance on the meaning of the phrase "business of insurance," as used in the MFA. The phrase is undefined in the statute, so the Court has looked to "the ordinary understanding of that phrase, illumined by any light to be found in the structure of the Act

---

of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance.") (citing Black's Law Dictionary 1236, 1286 (6th ed. 1990)).

[11] In *Highmark* an insurance company sued a rival seeking injunctive relief and damages for advertisements that allegedly included misleading statements about the plaintiff's insurance, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). 276 F.3d at 163-64. The defendant moved to dismiss on two bases: first, that the advertisement did not substantially affect interstate commerce and, therefore, the Lanham Act did not apply, and, second, that the Lanham Act claims were reverse-preempted by the Pennsylvania Unfair Insurance Practices Act. *Id.* at 164. The district court denied the motion to dismiss and entered a preliminary injunction. *Id.* We affirmed. *Id.*

and its legislative history." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979). We do likewise, looking to how the Supreme Court employed that phrase in *National Securities*.

In its opinion there, the Court noted that Congressional debates surrounding the MFA were "mainly concerned with the relationship between insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies," none of which was then at issue in the case before it. *National Securities*, 393 U.S. at 458-59. Accordingly, the Court analyzed the phrase "business of insurance" in the broader context of Congress's reaction to *South-Eastern Underwriters*, and, in so doing, found "it [was] relatively clear what problems Congress was dealing with." *Id.* at 459. "Congress was concerned" with preserving for state regulation that which had been understood as beyond the Commerce Clause before *South-Eastern Underwriters*, specifically, "the type of state regulation that centers around the contract of insurance." *Id.* at 460.

Having thus set the stage, the Supreme Court identified the "core of the 'business of insurance'" as "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement[.]" *Id.* In addition, *National Securities* provided several examples of that "core": "the fixing of [insurance] rates"; "the selling and advertising of [insurance] policies"; and the "licensing of companies and their agents." *Id.* *National Securities*, however, made clear that the sweep of the "business of insurance" goes beyond the core to reach "other activities of insurance companies [that] relate so closely to their status as reliable insurers that they too must be placed in the same class."

*Id.*  "[W]hatever the exact scope of the statutory term," the touchstone remains the impact on the "relationship between the insurance company and the policyholder."  *Id.*

The Court later admonished that not everything that "indirect[ly] [a]ffects" policyholders or "redounds to the[ir] benefit" in some way falls within the "business of insurance." *Fabe*, 508 U.S. at 508-09 (citing *Royal Drug*, 440 U.S. at 216-17).  After all, the "statute d[oes] not purport to make the States supreme in regulating all the activities of insurance companies[.]"  *National Securities*, 393 U.S. at 459.  Thus, "terms such as 'reliability' and 'status as a reliable insurer'" cannot "be interpreted" so "broad[ly]" that "almost every business decision of an insurance company could be included in the 'business of insurance.'"  *Royal Drug*, 440 U.S. at 217.

## B.    *Sabo* and *Highmark* Remain Good Law

In this appeal, the Delaware Department of Insurance argues that our decisions in *Sabo* and *Highmark* are no longer good law, citing three reasons.  First, the Department argues that *Sabo* conflicts with the Supreme Court's earlier decision in *Fabe*, 508 U.S. 491.  Second, it argues that *Sabo* was implicitly overruled by a later Supreme Court decision, *Humana Inc. v. Forsyth*, 525 U.S. 299.  And third, it argues that our own decisions after *Sabo* and *Highmark* conflict with those two cases.  More specifically, the Department says that the lack of any mention of the threshold inquiry in *Suter v. Munich Reinsurance Co.*, 223 F.3d 150 (3d Cir. 2000), represents the true post-*Humana* precedent of our Court, replacing *Sabo* and *Highmark*.  None of those arguments holds water, and, contrary to each of them, the threshold inquiry

prescribed in *Sabo* and reiterated in *Highmark* remains the law of this Circuit.

The Department's arguments contain two foundational flaws. First, they misread the origins of the threshold inquiry. The contention that the threshold inquiry does not derive from § 1012(a) is plainly wrong, as demonstrated by the description we have just given of *Sabo*. *See supra* Section II.A.1.[12] As already noted, *Sabo* expressly cites § 1012(a) when stating that "[t]he threshold question in determining whether the antipreemption mandate of 15 U.S.C. § 1012(b) applies is whether the challenged conduct broadly constitutes the 'business of insurance' in the first place." *Sabo*, 137 F.3d at 190; *see also id*. at 189 ("If it is determined that the alleged

_____

[12] The Department misunderstands footnote two of *Sabo*. We said there "that federal courts have seemingly disagreed as to the proper analytic inquiry into [MFA] preclusion[,]" and, therefore, we thought it important "to discuss our analysis in detail." *Id*. at 189 n.2. That footnote observed that some courts had adopted a three-part test "that does not require a specific conclusion that the defendant's conduct constitutes the business of insurance," but others had adopted a four-part test that did require such a specific conclusion. *Id*. Our holding that there is a threshold inquiry deriving from § 1012(a) relied on none of those cases. Indeed, it would have been difficult to do otherwise, as none of them relies on § 1012(a) for a threshold inquiry, and no one here suggests they do. In that context, our statement that "it is important to discuss our analysis in detail" is more naturally read as divergence from – not a subscription to – the position stated in those other cases.

conduct at issue broadly constitutes the 'business of insurance,' and is therefore subject to state regulation *under section 1012(a)*, the next issue is whether the anti-preemption mandate of section 1012(b) precludes a federal cause of action." (emphasis added)).  The quoted language from *Sabo* speaks for itself.

Second, as we proceed to discuss now, the Department perceives jurisprudential conflict where there is none.  Those supposed conflicts are instances where we or the Supreme Court analyzed MFA reverse-preemption under the first clause of § 1012(b), focusing on what was at issue in those cases.  Whether reverse-preemption is warranted under the first clause of § 1012(b) when it is implicated is a separate question from whether reverse-preemption is implicated in the first place under § 1012(a).

### 1.    *Sabo* does not conflict with *Fabe*

By way of example, the Department wrongly asserts that *Fabe* conflicts with *Sabo*.  *Fabe* stands for the unremarkable proposition that the first clause of § 1012(b) has three requirements, but it does not foreclose a threshold inquiry derived from § 1012(a).  In *Fabe*, the liquidator of an insurance company brought a declaratory judgment action in federal court "seeking to establish that [a] federal priority statute [did] not preempt [an] Ohio law designating the priority of creditors' claims in insurance-liquidation proceedings."  508 U.S. at 495.  The federal statute "accord[ed] first priority to the United States with respect to a bankrupt debtor's obligations[,]" while the Ohio statute "confer[red] only fifth priority upon claims of the United States in proceedings to liquidate an insolvent insurance company[.]"  *Id*. at 493.

*Fabe* quoted the first clause of § 1012(b) and gave passing acknowledgment to uncontested points. *Fabe*, 508 U.S. at 500-01. After that, "[a]ll that [was] left" for analysis, under the first clause, was "whether the Ohio priority statute [was] a law enacted 'for the purpose of regulating the business of insurance.'" *Id.*

The Supreme Court's treatment of that contested point included analysis akin to our threshold inquiry. The Court first clearly stated that "the Ohio statute" was "a law 'enacted for the purpose of regulating the business of insurance,' within the meaning of the first clause of § [1012(b)]." *Id.* at 505. It then backtracked, refusing to fully reverse-preempt the federal law with respect to creditors who were not policyholders, holding that the state law was "not a law enacted for the purpose of regulating the business of insurance" to the extent it benefited such creditors. *Id.* at 508 & n.8. Additionally, it refused to hold that the portion of the state law providing for administrative costs for creditors other than policyholders reverse-preempted federal law. *Id.* at 509. It reasoned that the provision's "connection to the ultimate aim of insurance [wa]s too tenuous." *Id.* Although pressed by the dissent to justify such a "compromise holding," *id.* at 518 (Kennedy, J., dissenting), the majority provided no textual hook for its holding. *See id.* at 508-09 & n.8 (arguing that the dissent had conceded that the statute need not "stand or fall in its entirety" and observing that the dissent had cited nothing preventing the majority from finding certain parts of the statute had effected a reverse-preemption and others had not). Of more importance for present purposes, it never foreclosed § 1012(a) from playing the role we have concluded it plays.

Simply put, while *Fabe* focuses on § 1012(b), it is not irreconcilable with our threshold inquiry or the conclusion that § 1012(a) is the source of it.

## 2.    *Sabo* does not conflict with *Humana*

Nor does *Humana* conflict with *Sabo* or overrule it. In *Humana*, insurance policy beneficiaries alleged that an insurance company engaged in a scheme to hide discounts that the company had received from a hospital, and that it did so to prevent the beneficiaries from sharing in the savings. 525 U.S. at 303-04. The plaintiffs contended that this violated both the Nevada law regulating insurance fraud and RICO. *Id*. at 302. Although the state and federal laws represented "differ[ing]" "remedial regimes," the Supreme Court concluded that "RICO can be applied in this case in harmony with the State's regulation," and, therefore, "the [MFA] does not bar the federal action." *Id*. at 303.

*Humana* touched only on the first clause of § 1012(b), without suggesting a rejection of a threshold inquiry under § 1012(a). The first sentence of the opinion introduced the case as one "concern[ing] the regulation of insurance by the states, as secured by the [MFA], 59 Stat. 33, as amended, 15 U.S.C. § 1011 et seq." *Id*. at 302. But that same paragraph made it apparent that the Court was going to limit its discussion solely to the one requirement of the first clause of § 1012(b) then in dispute[13] – whether RICO "'invalidate[d], impair[ed], or

---

[13] Recall that the three requirements for application of MFA reverse-preemption, as set forth in the first clause of § 1012(b), are as follows: "(1) the federal law at issue does not specifically relate to the business of insurance; (2) the state law

supersede[d]' the State's regulation." *Id.* at 302-03.  Although *Humana* states that § 1012(b) is "the centerpiece of this case," *id.* at 306, it discusses only two of the three "first clause" requirements, and one of those only in passing, with the remaining one being assumed to be satisfied.  *Id.* at 307 ("RICO is not a law that 'specifically relates to the business of insurance.'  This case therefore turns on the question: Would RICO's application to the employee beneficiaries' claims at issue 'invalidate, impair, or supersede' Nevada's laws regulating insurance?").

That *Humana* proceeded to examine whether RICO conflicted with state law without tarrying along the way does not mean that *Humana* addressed the existence of a threshold inquiry derived from § 1012(a).  It did not, and thus does not foreclose it.  The Department's suggestion that *Humana* sets out the first clause of § 1012(b) as the exclusive "test for the [MFA]" preemption ignores what *Humana* makes plain in context – that the Court was quickly getting to the heart of the issue without purporting to write a treatise on every aspect of the MFA.[14]  *Cf. United States v. Sineneng-Smith*, 140 S. Ct.

---

regulating the activity was enacted for the purpose of regulating the business of insurance; and (3) applying federal law would invalidate, impair, or supersede the state law." *Highmark*, 276 F.3d at 166.

[14] While we refer to the inquiry derived from Section 1012(a) as a "threshold" one, it need not be addressed in every case.  Sound advocacy may well lead parties to concede or assume the threshold inquiry has been met, thus allowing them to address other requirements for MFA reverse-preemption that may be more readily dispositive.  Judicial economy may

1575, 1579 (2020) ("[Courts] wait for cases to come to them, and when [cases arise, courts] normally decide only questions presented by the parties.") (discussing the "principle of party presentation"); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968) ("[T]his Court does not decide important questions of law by cursory dicta inserted in unrelated cases."); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 738 n.41 (3d Cir. 1988) (declining appellee's "invitation to transform what is in essence stray language and at best no more than dicta into a binding holding").

---

likewise prompt a court to resolve an MFA reverse preemption question in a similar way.  Courts often assume satisfaction of some analytical steps, where appropriate, to get to the heart of a matter.  *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 234-43 (2009) (loosening the rigidly ordered two-step analysis of the qualified immunity inquiry and allowing courts to begin with either step to prevent the misuse of "substantial expenditure[s] of scarce judicial resources … [on matters that] have no effect on the outcome of the case"); *United States v. Leon*, 468 U.S. 897, 924 (1984) ("There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated."); *Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 3.    *Sabo* does not conflict with *Suter*

Also contrary to the Department's assertion, our own decision in *Suter v. Munich Reinsurance Co.* does not suggest there is a conflict between *Humana* and *Sabo*, or that *Humana* implicitly overrules *Sabo*. Indeed, *Suter* mentions neither case. *Suter* involved a suit brought in state court by the liquidator of an insurance company against a German reinsurance company over an alleged breach of "certain reinsurance treaties." 223 F.3d at 152. The reinsurance treaties "include[d] arbitration clauses governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards." *Id.* Congress enacted a removal provision, 9 U.S.C. § 205, as a part of an act to enforce that convention (the "Convention Act"). *Id.* at 154-55. Relying on those procedural tools, the defendant first removed the case to district court under 9 U.S.C. § 205, and then tried to both compel arbitration and stay the district court proceedings pending arbitration. *Id.* at 152. The plaintiffs argued for remand on three grounds, two of which are relevant here: first, that a provision in the reinsurance treaty waived the defendant's right to remove and, second, that the Convention Act and Federal Arbitration Act (the "FAA") were reverse-preempted by the MFA. *Id.* The district court remanded the case to state court on the first ground without reaching the plaintiffs' other arguments or ruling on the defendant's motion. *Id.* After reversing the district court on the only ground that it examined, we declined to affirm on the basis of MFA reverse-preemption. We examined only one of the three requirements of the first clause of § 1012(b) and found it was not satisfied. *Id.* at 162. To begin, we noted that "there is no contention that either the Convention Act or the FAA 'specifically relate to the business of insurance.'" *Id.* at 160. We briefly identified the remaining

requirements of the first clause of § 1012(b) and assumed one of them away without discussion. *See id*. at 160-61 ("Thus the only issues are whether these statutes as applied in the instant case invalidate, impair or super[s]ede a New Jersey statute that was enacted for the purpose of regulating the business of insurance."); *id*. at 161 ("For purposes of this decision, we will assume that [the statutory] provisions were enacted for the purpose of regulating the business of insurance[.]"). We then briefly explained why "application of the Convention Act to th[e] suit does not impair the New Jersey Liquidation Act." *Id*. at 162. Nothing in that analysis overrides *Sabo*, even if the approach looked at § 1012(b) without pausing at § 1012(a). Given *Sabo*'s status as pre-existing precedent, *Suter* could not have overruled *Sabo*, *see* Third Circuit I.O.P. 9.1, and there is no indication that it intended to.

### 4.    The Department's remaining arguments

The Department makes two additional points that warrant brief mention. First, it notes that we are alone in holding that there is a threshold inquiry derived from § 1012(a). Second, it contends that each of the other circuits that previously used a four-factor test have abandoned it. Neither point would, of course, overrule *Sabo* or *Highmark*, but they might provide a basis for en banc review if they were persuasive. *Cf. In re Krebs*, 527 F.3d 82, 86 (3d Cir. 2008) (a panel may neither overrule a prior precedential opinion "because we are no longer persuaded by its reasoning" nor because "[s]everal of our sister courts of appeals have decided the … issue" contrary to that precedent). They are not. The Department identifies no post-*Humana* precedential opinion of our sister circuits that engages in legal analysis grappling with

(let alone dispensing with) something akin to *Sabo*'s threshold inquiry under § 1012(a).

The one pre-*Humana* case that explicitly parts ways with *Sabo* is *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037 (7th Cir. 1998), and it misreads *Sabo*. Without explanation or analysis, *Autry* lumps *Sabo* in with opinions applying a four-factor test derived from § 1012(b). *Autry*, 144 F.3d at 1041. Hence, the reasons articulated in *Autry* for rejecting a four-factor test derived from § 1012(b) are errantly applied to *Sabo* because, as we have explained, *Sabo*'s threshold inquiry derives from § 1012(a).[15]

---

[15] *Autry* declined to find that its own four-part precedent was no longer good law. In a footnote, the opinion acknowledges the three-factor test that it recited does not square with *American Deposit Corp. v. Schacht*, 84 F.3d 834, 838 (7th Cir. 1996). But *Autry* suggests that it might be appropriate to apply the fourth factor later in the MFA analysis:

> In *Schacht* we first addressed whether the state statute was "enacted ... for the purpose of regulating the business of insurance." After answering that question in the affirmative, we asked whether the particular activity at issue in the case was part of the "business of insurance." No doubt we took this second step because *Fabe* counsels that a statute "need not be treated as a package which stands or falls in its entirety," *Fabe*, 508 U.S. at 509 n.8, and instead that a state statute should only displace federal law "to the extent that it regulates policyholders," *id*. at 508. Because we find that the Illinois statute

### C.     The Threshold Inquiry is Not Satisfied

We now turn to the task of applying the threshold inquiry.   That involves identifying the conduct being challenged by the party asserting federal supremacy and then asking if that conduct constitutes the "business of insurance."

#### 1.     The Challenged Conduct is Non-Disclosure of Records Maintained by the State Absent a Confidentiality Agreement

To recap, the federal government brought this summons enforcement action to force the Department to provide information related to certain micro-captives.  The Department has steadfastly refused to provide that information without the federal government first signing a confidentiality agreement. The Department's refusal, and that alone, is the challenged conduct.   More specifically, the challenged conduct is the Department's insistence that it need not provide documents and related testimony that are responsive to Request 1 of the summons.     The  Magistrate  Judge's  Report  and Recommendation, adopted by the District Court, characterized the conduct in fundamentally the same way, while noting that the conduct tracks the pertinent exception to the general

---

regulating premium financing agreements is not one "enacted ... for the purpose of regulating the business of insurance," we need go no further.

*Autry*, 144 F.3d at 1042 n.3.

disclosure proscription in § 6920 of the Delaware Insurance Code.

The Department proposes that, to define the challenged conduct for purposes of the threshold inquiry, we should examine the purpose of § 6920 and how it fits into the State's overall regulatory scheme. But that proposal is tantamount to asking us to skip the threshold inquiry. The Department wants us to characterize the challenged conduct by asking, effectively, whether § 6920 was "enacted … for the purpose of regulating the business of insurance." Transforming the threshold inquiry into that post-threshold requirement from the first clause of § 1012(b) cannot be reconciled with *Sabo*'s admonition that those are separate questions. *Sabo*, 137 F.3d at 191.

Furthermore, the Department's proposal is not faithful to how we went about characterizing the conduct at issue in *Sabo* and *Highmark* for purposes of the threshold inquiry. In *Sabo*, we defined the challenged conduct as a "churning scheme" involving fraudulently trading insurance policies, fraudulently advertising an insurance policy as a retirement savings plan, and coercing employees to engage in those activities. *Sabo*, 137 F.3d at 187, 191. Although such conduct, if it occurred, would violate state law, no reference was made to state law in characterizing that conduct. *Id*. at 191-92. In *Highmark*, the plaintiff alleged that a rival's advertisements included misleading statements about the plaintiff's insurance, ostensibly running afoul of the Pennsylvania Unfair Insurance Practices Act. *Highmark*, 276 F.3d at 163-64. We characterized "the action complained of" as "the advertising" or the "advertising practices of the parties," with no mention of the state law. *Id*. at 166. Thus, in keeping with *Sabo* and

*Highmark*, we reject the contention that defining the challenged conduct for purposes of the threshold inquiry entails examining the purpose of § 6920 and how it fits into Delaware's overall regulatory scheme.

### 2.     The Challenged Conduct Does Not Constitute the Business of Insurance

The Department's refusal to provide documents and testimony responsive to Request 1 of the summons is not the "business of insurance."[16]  As an initial matter, it is plainly not the "core of the 'business of insurance.'"  *See National Securities*, 393 U.S. at 460 ("The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement – these [are] the core of the 'business of insurance.'").  It also cannot reasonably be understood as "[an]other activit[y] of insurance companies [that] relate[s] so closely to [their] status as reliable insurers that [it] must be placed in the same class."  *Id*.  It stands, rather,

---

[16] The Report and Recommendation indicated the parties were generally in agreement that, if the petition were granted, the IRS would get both the documents and the testimony.  The Magistrate Judge noted that the Department made a passing argument that the federal government forfeited its ability to get testimony.  But he rejected that argument as being without legal support and that rejection was adopted by the District Court in its overall endorsement of the Report and Recommendation.  The Department does not mention the forfeiture argument before us and, thus, we do not address it.  *See Geness*, 902 F.3d at 355 (*supra* at note 10).

somewhat removed from the "relationship between the insurance company and the policyholder." *Id*.

The Department nevertheless presses the argument that, even if the challenged conduct is its adherence to the strictures of § 6920 in the face of an action to enforce Request 1 of the summons, such conduct constitutes the "business of insurance." That conclusion follows, the Department says, because the confidentiality provision at issue deals with materials submitted in connection with the licensure of would-be captive insurers and examinations of already-approved captive insurers "for the purpose of determining the solvency and safety of insurers, and for the protection of its policyholders." (Answering Br. at 38.) If § 6920 does not reverse-preempt the IRS's summons authority, the Department claims, then applicants and already-approved captive insurers will be less forthcoming with the Department. The Department therefore contends that affirming the District Court will indirectly endanger those who are insured. By that route, the Department reasons that its adherence to § 6920 should be placed in the category of the "business of insurance."

For that argument to hold water, however, we must accept that affirming the District Court would lead to a change in behavior by captive insurers (or their managers) that would reduce the reliability of captive insurers. That is a contention that cannot survive scrutiny. As an initial matter, the substantive requirements for licensure and continued permission to operate under certificates of authority issued by the Department is not altered by our affirmance of the District Court's ruling. The Department has the authority to obtain documents it requires for licensure and subsequent examinations and can impose consequences on companies that

will not provide them.  *See*, *e.g.*, 18 Del. Code Ann. §§ 6903, 6908, 6909.[17]    Simply put, the Department will be no less

_____

[17] Although no case has been cited to us construing any of these provisions of the Delaware Insurance Code, it seems clear on their face that they endow the Department with such powers.  For example, one provision provides in part: "Before receiving a certificate of authority, an applicant captive insurance company shall file with the Commissioner a certified copy of its organizational documents, a statement under oath of its president or other authorized person showing its financial condition, and any other statements or documents required by the Commissioner."  18 Del. Code Ann. § 6903(c)(1).  It, further, indicates that the Department has the authority not to approve the certificate in the first instance if its filings do not comply with Delaware Captive Law.  *See id.* § 6903(f) ("If the Commissioner is satisfied that the documents and statements that such captive insurance company has filed comply with the provisions of this chapter, the Commissioner may grant a certificate of authority authorizing it to do insurance business in this State….").  As previously mentioned, captive insurance companies are generally examined triennially to determine, among other things, their "ability to fulfill [their] obligations and [their] compliance with the provisions of this chapter."  18 Del. Code Ann. § 6908.  The Department may "suspend or revoke" a captive insurance company's certificate of authority, if, "upon examination, hearing or other evidence," the Department finds that the company has "refus[ed] or fail[ed] to submit … any … report or statement required by law or by lawful order of the Commissioner" or "fail[ed] otherwise to comply with the laws of" Delaware.  18 Del. Code Ann. § 6909.

entitled to the information it currently receives to license captive insurance companies than it has previously been. The same is true of the Department's entitlement to information to determine whether already-licensed captive insurance companies should be allowed to continue to operate.

Moreover, according to the Department and Amici, the information sought here is as legally obtainable by a direct summons or subpoena to the captive insurance companies (or, perhaps, to their managers) as a summons directed to the Department. Accepting those arguments on their own terms, insurance companies will have no plausible reason to withhold information from the Department that turns on the outcome of this case. That is, we are being asked to accept that, but for the potential availability of the novel argument that § 6920 reverse-preempts the IRS's summons authority, a prospective or existing captive insurer will intentionally withhold required information from the Department.

But if a captive insurer is so well informed about the IRS's enforcement powers and defenses against them that it thinks of MFA reverse-preemption in this context, such a company is almost certainly aware of the obvious threat of a direct IRS summons or subpoena. And it must also be aware that being less than forthcoming with the Department risks foregoing or losing a certificate of authority to operate as an insurer. In short, it is hard to see the causal connection the Department is trying to draw. If enforcement of the summons is not the but-for cause of a company's changing its transparency (or lack thereof) with the Department, then the Department is in the same position regardless of how we decide the present dispute. And if that is so, then affirming the District Court will neither undermine the insurer-insured

relationship nor the insurer's reliability as an insurer. Accordingly, we reject the Department's argument that its adherence to § 6920 constitutes the "business of insurance."

**III.    CONCLUSION**

For the forgoing reasons, the District Court's order will be affirmed.